In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1088

NICOLE HARRIS,

*Petitioner-Appellant*,

*v.*

SHERYL THOMPSON, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CV 6257—**James B. Zagel**, *Judge.*

ARGUED JUNE 7, 2012—DECIDED OCTOBER 18, 2012

Before MANION, KANNE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Illinois prisoner Nicole Harris was convicted in an Illinois state court of murdering her four-year-old son, Jaquari Dancy, and was sentenced to 30 years in prison. It is undisputed that Jaquari died from asphyxiation and that the instrument of death was an elastic band that had come loose from a fitted bed sheet. The parties also agree that Jaquari was not alone when he died. His five-year-old

brother Diante was in the top bunk of the bed the two shared. On the day of Jaquari's death, Harris disciplined the boys for leaving the apartment while she was across the street doing laundry. The State's theory was that Jaquari would not stop crying, and Harris grew so mad that she strangled him with the elastic band while Diante slept in the bunk above. The defense theory was that Jaquari had wrapped the elastic around his own neck and accidentally asphyxiated himself while Harris was at the laundromat. At trial, by far the most damning evidence against Harris was her videotaped confession, recorded the day after Jaquari's death following 27 hours of intermittent interrogation at a Chicago police station. In the tape, Harris admitted to choking Jaquari with the elastic band because he had misbehaved.

Harris's best exculpatory evidence was the proffered testimony of Diante, age six at trial, who has maintained since he was first interviewed the day after Jaquari's death that his brother wrapped the elastic band around his own neck and that neither his mother nor father was present when he did so. The jury never heard Diante's testimony, however, because the trial court determined that Diante was not a competent witness. No one disputes that the trial judge made a legal error in reaching this conclusion: he reversed Illinois law's presumption of competency by requiring the defendant, as the proponent of the witness, to prove that Diante was competent to testify. Illinois's competency statute places the burden of proof on the party challenging competency — in this case, the

State — even when the witness is a child. See 725 ILCS 5/115-14(c).

In this collateral attack on her conviction, Harris contends that the trial court's exclusion of Diante's testimony violated her federal Sixth Amendment right to present witnesses in her own defense, see *Washington v. Texas*, 388 U.S. 14 (1967), and that she received ineffective assistance of counsel at Diante's competency hearing. The original state trial court denied Harris's motion for a new trial on these and other grounds. The Illinois Appellate Court rejected her direct appeal, and the district court determined that federal habeas relief was not available.

We reverse with instructions to grant the writ. A court's exclusion of defense evidence violates the Compulsory Process Clause of the Sixth Amendment where the evidence is material to the outcome of trial and the application of the evidentiary exclusion is arbitrary or disproportionate to the state's legitimate interests promoted by the rule. Although Diante and his testimony posed challenges, the complete exclusion of this critical exculpatory evidence in this case was arbitrary and disproportionate to the truth-seeking and reliability concerns advanced by witness competency restrictions. We review this issue *de novo* because it was not addressed by the Illinois courts. The disqualification of Diante as a witness violated Harris's Sixth Amendment right to present a complete defense.

We also conclude that trial counsel's serious errors in the competency hearing deprived Harris of the right to

effective counsel. As the only eyewitness to Jaquari's death, Diante's testimony was essential to Harris's defense. His competency hearing was crucial, but Harris's counsel was not ready for it: he did not interview Diante, he did not secure the presence of a witness who would have shown that Diante's recollections of what happened were consistent and credible, and he did not correct the trial court's misapplication of the burden of proof. Under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, each of these mistakes — lack of investigation, failure to secure a key witness, and ignorance of applicable law — amounted to constitutionally deficient performance of defense counsel. If counsel had taken simple and obvious steps to prepare for the hearing, it is reasonably likely that Diante would have been deemed competent. And if the jury had heard his testimony, there is a reasonable probability that the outcome of the trial would have been different. In concluding that Harris was not prejudiced by her counsel's errors at the competency hearing, the state appellate court unreasonably applied *Strickland*.

I. *Factual and Procedural Background*

The underlying facts of this case are detailed in the Illinois Appellate Court's decision affirming Harris's conviction and sentence. *People v. Harris*, 904 N.E.2d 1077 (Ill. App. 2009). Those facts are entitled to a presumption of accuracy, see 28 U.S.C. § 2254(e)(1), and they are in any event uncontested insofar as they are relevant to our decision.

A.  *Jaquari's Death and the Initial Investigation*

In May 2005, Harris, age 23, lived in an apartment on Chicago's west side with her boyfriend, Sta-Von Dancy, and their two sons, five-year-old Diante and four-year-old Jaquari. In the afternoon of Saturday, May 14, Harris and Dancy went to the laundromat across the street, leaving their sons home alone for approximately 40 minutes with instructions to stay in the apartment. While the clothes were drying, Harris returned home and discovered Diante in the hallway and Jaquari playing outside. Harris yelled at the children and ordered them to their bedroom, where Jaquari began crying. At this point, Dancy returned to the apartment, spoke to his children in their room, and lay down to take a nap.

When he awakened, Dancy discovered Jaquari lying on the floor of the boys' bedroom, unresponsive and blue in the face. An elastic band hanging from Diante's fitted sheet was wrapped repeatedly (close to ten times) around Jaquari's neck. Dancy unwrapped the band and performed mouth-to-mouth resuscitation. Jaquari remained unconscious. Dancy lifted him up and ran outside, where he met Harris returning again from the laundromat. The two jumped in their car and raced off in search of a hospital with Harris driving and Dancy continuing CPR on Jaquari in the back seat. They called 911 and eventually met an ambulance that took Jaquari to a hospital. Harris and Dancy returned home to retrieve Diante and then went to the hospital, where Jaquari was pronounced dead.

Chicago police officers arrived at the hospital to begin their investigation into Jaquari's death. After a brief conversation with detectives around 7:15 p.m., Harris and Dancy agreed to accompany them to the police station to answer further questions. Detectives interviewed the parents in separate rooms. With Diante on her lap, Harris answered questions for approximately 30 minutes before the detectives left to continue their investigation at the scene. Around midnight, Diante was taken to his grandmother's home by an official with the Department of Child and Family Services. Back at the family's apartment, officers ordered crime scene technicians to collect the sheet with the loose elastic band and a telephone cord they suspected might have been used to strangle Jaquari. After speaking with other tenants in the building, the detectives returned to the station to confront Harris with discrepancies between her earlier account and what they had learned from her neighbors, who said she had struck her children with a belt that day. According to the detectives, after approximately fifteen minutes of questioning, Harris broke down, started crying, and spontaneously admitted, "I wrapped the phone cord around Jaquari's neck and then I wrapped the elastic band from the bed sheet around his neck to make it look like an accident." *Harris*, 904 N.E.2d at 1080. That first confession was undisputedly false: the autopsy would later show that the telephone cord played no role in Jaquari's death.

The detectives read Harris her *Miranda* rights, which she said she understood. Over the next 24 hours, Harris recanted her initial unwarned confession, slept

overnight in a holding cell, took a polygraph examina-
tion (with inconclusive results), and confessed a second
time — this time saying she had used the elastic band,
which conformed to the physical evidence. A prosecutor
arrived and obtained a videotaped statement of Harris's
confession. In it, Harris stated that she had struck
Jaquari with a belt when she came over from the laundro-
mat and that because he would not stop crying, she
wrapped the sheet's elastic band around his neck until
she saw blood coming from his nose. She said she then
left the room, attempted to fix a phone jack, and returned
to the laundromat to retrieve her clothing. She was
charged with first-degree murder. Her trial began on
October 20, 2005 in Cook County Circuit Court.

B.  *The Trial*

At trial, Harris's videotaped confession provided the
State's most powerful evidence against her.[1] Several police
officers and prosecutors testified for the prosecution to
discuss the investigation and interrogation of Harris.

---

[1] In pretrial proceedings, Harris filed a motion to suppress
the videotaped confession as involuntary. She has argued — to
the trial court, on direct appeal, in the district court, and in
this appeal — that the police used an improper two-step
"question first, warn later" interrogation procedure, rendering
both the initial unwarned confession and later confessions
inadmissible. See *Missouri v. Seibert*, 542 U.S. 600 (2004). Because
we grant Harris's habeas petition on other grounds, we do
not consider here whether a *Seibert* violation occurred.

Dancy was called by both the State and the defense. He testified that when he found Jaquari lying inert on the floor, he saw a clear mucus bubble coming out of the boy's nose. Dancy said he had seen the elastic band before, hanging from Diante's sheet on the top bunk down almost to the bottom bed. Dancy also testified that, on previous occasions, Jaquari had played with the elastic by wrapping it around his neck. According to Dancy, Diante was in the room lying on his top bunk bed when he found Jaquari.

The State also called Dr. John Scott Denton, who had conducted the postmortem examination. Dr. Denton found impression or ligature marks on Jaquari's neck that were an "exact fit" to the blue sheet's elastic band. His report indicated that the impression marks did not match the telephone cord that had initially aroused the police's suspicions and which Harris had identified as the murder weapon in her first, "spontaneous" confession. Dr. Denton also acknowledged that he had at first concluded after the May 15 autopsy that Jaquari's death was accidental — specifically, that Jaquari had "become entangled with an elastic bed fitted sheet and had fallen to the ground from his upper bunk." *Harris*, 904 N.E.2d at 1083. Several days later, however, a detective told Dr. Denton that Harris had confessed to strangling Jaquari. Dr. Denton also learned from the investigation report that Jaquari slept on the bottom bunk and that traces of blood were found on the lower bed's linen. Dr. Denton then revised his medical opinion to conclude that Jaquari's death was a homicide. Dr. Denton did not say whether he was also told that Diante had

been present when Jaquari died and said he saw Jaquari wrap the elastic around his own neck.[2]

Harris testified in her own defense. She testified that when she came home from the laundromat to find her children outside the apartment, she scolded them and sent them to their room but did not strike them. She then fiddled with a telephone jack, helped Dancy to the bedroom to take a nap, and went across the street to get her clothes from the dryer. Upon her return to the apartment, she was met by Dancy outside bearing Jaquari in his arms. This testimony obviously contradicted the videotaped confession the jury had already seen. But Harris told the jury that the videotaped confession was the product of a 27-hour coercive interrogation in which detectives pushed her, deprived her of food and

---

[2] Harris has argued to the state courts and in her federal habeas proceedings that the State failed to prove the *corpus deliciti* element of first-degree murder — that is, proof that a crime occurred. This due process claim is cognizable in habeas review under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Under Illinois law, "in establishing the *corpus delicti*, there must be some evidence, apart from the confession, demonstrating that a crime occurred." *People v. Willingham*, 432 N.E.2d 861, 864 (Ill. 1982). Harris asserts that Dr. Denton's opinion that Jaquari's death was a homicide was derived from her confession and therefore did not independently corroborate criminal agency. Because we grant habeas relief on other grounds, we do not pass on Harris's due process argument.

water, threatened her, and promised her lenient treatment in exchange for cooperation. In the videotaped confession, though, she had said that the police had fed her and treated her well and had made neither threats nor promises.

The defense theory of accidental death was supported by Dancy, who had previously seen Jaquari coiling the sheet's elastic band around his neck, and by other family members who spoke more generally about his curiosity and playfulness. For example, one aunt said that she had once seen Jaquari put a plastic laundry bag over his face.

The defense's key witness, however, was six-year-old Diante, who was with Jaquari when he died. The day after Jaquari's death, Diante was interviewed by Ale Levy, an investigator with the Child Advocacy Center, an agency that partners with the Chicago Police Department, the State's Attorney, and the Department of Child and Family Services. A Chicago police detective who was present for Levy's interview took notes. The notes state that Diante "knows his age," "his colors," "different amounts," his "grade in school," and the "difference between truth/lies." Diante indicated that he "knows about Jaquari's death, knows Jaquari was at the hospital." Diante also said that Jaquari had "wanted to go outside" but he "got in trouble." "Mom and Dad came home [and] gave both of them a spanking. Mom spanked Diante with Belt on his leg," which "was bleeding." Most important, Diante said that "Jaquari was playing [and] wrapped elastic around neck from blue

sheet" and that Diante was "playing Spiderman game" and "couldn't help Jaquari get out of his sheet." Levy wrote, "Diante & Jaquari were supposed to go to sleep." Towards the end, Jaquari told Levy, "'Jaquari had a bubble' while he was asleep." He said, "Jaquari died it happened in their bedroom" and "Diante was sleeping when Jaquari died."

### C. *The Competency Hearing and Ruling*

Although Diante was also listed as a witness for the State, the State moved to disqualify him as incompetent to testify. Under Illinois law, every person is presumed competent to be a witness and will be permitted to testify unless he or she is either (1) "Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him or her"; or (2) "Incapable of understanding the duty of a witness to tell the truth." 725 ILCS 5/115-14(a), (b); see *People v. Velasco*, 575 N.E.2d 954, 959 (Ill. App. 1991). The burden of proof is on the party challenging competency. See 725 ILCS 5/115-14(c); *People v. Hoke*, 571 N.E.2d 1143, 1148 (Ill. App. 1991).

The trial court began the competency hearing with a basic legal error, stating "the Defense, it's their witness whom they're attempting to call. They shall bear the burden of proof in demonstrating Diante's competency." No objection was made. With defense counsel's agreement, the hearing took place without Harris present. Diante took the stand and fielded some preliminary

questions from defense counsel, spelling his name and stating his age, birthday, the cities where he had lived, his teacher's name, and the colors of certain objects. Asked by the court if he knew the difference between a truth and a lie, Diante responded, "Telling a lie, you might get in trouble. Telling the truth, you might get a star," which he agreed was "a good thing."

Diante also described the events from the day Jaquari died. On the last day that Diante had been in his room at the North Chicago apartment, he had been with Jaquari and was "Playing my game." Defense counsel asked what Jaquari was doing and Diante replied, "Jaquari was playing with that string and wrapping it around his neck." S.A. 118. Asked what string he was referring to, Diante said it was the band from the blue sheet. He also testified that no one else was in the room with them when Jaquari was wrapping the sheet's elastic around his neck. The prosecutor later asked whether Jaquari "wrapped something around his neck from the sheet." Diante nodded and said that the sheet was "On my bed" and that Jaquari was "Standing on the floor" while Diante was "Sitting, playing with my toys." S.A. 125. The prosecutor also asked Diante if he remembered telling a Department of Child and Family Services investigator named Karen Wilson — who spoke with Diante the day after Levy did — that he was asleep when Jaquari "got hurt." Diante answered yes. S.A. 127.

In his direct questioning, defense counsel had asked Diante whether he knew "the difference between real people and cartoons." S.A. 118. Diante said he did and

named "Scooby-Doo, Tom and Jerry" as examples of the latter. S.A. 119. Later, the prosecutor followed up on this line of questioning, but after referring to the original difference between real people and cartoons, the prosecutor shifted to use the word "real" differently to ask about the difference between real people and fictional characters. This shift caused some confusion:

Q   Okay. Now, you were talking about some cartoons a couple of minutes ago. You were talking about Scooby-Doo, and cartoons and real things, right?

A   (Nodding.)

Q   Do you think Spiderman is real?

A   Yes.

Q   And have you ever seen Spiderman in person?

A   Yes.

Q   Okay. And what did you say to Spiderman when you saw him in person?

A   Nothing.

Q   You didn't say anything to him?

A   (Nodding.)

Q   Have you ever seen Scooby-Doo?

A   No.

Q   Okay. Is Scooby-Doo real?

A   No.

Q   Okay. Scooby-Doo is what?

A   A movie.

Q   Okay. And how about The Hulk? Is The Hulk real or is he something else?

A   Something else.

. . .

Q   Okay. Let's see. How about Santa Claus, is Santa Claus real?

A   Yes.

Q   And have you ever seen Santa Claus in person?

A   No.

S.A. 122-23. Later, the prosecutor asked whether Diante believed the tooth fairy was real, to which he said yes. S.A. 129. Consistent with the real-versus-cartoon framework established by the defense, Diante evidently understood the prosecutor to be asking whether Spiderman and Santa Claus were animated or human characters, and that they were "real" insofar as they were not cartoons, which was correct. See, *e.g.*, *Elf* (New Line Cinema 2003) (live-action film); *Spider-Man* (Columbia Pictures 2002) (same). At trial, Dancy testified that Diante was familiar with the recent Spiderman live-action films at the time of Jaquari's death.

The prosecutor asked Diante about Jaquari, and once again ambiguous questioning and a failure to follow up generated confusion:

Q   . . . . You told me earlier that you have seen Jaquari in heaven, right?

A   Yes.

Q   And do you remember the last time you saw Jaquari in heaven?

. . .

A   Where I was in the rainbow.

Q   When you were in the what?

A   In the rainbow.

Q   "In the rainbow"? You were in the rainbow?

A   Uhn-uhn. No, in the car.

Q   Oh, in the car. And you saw Jaquari in heaven then?

A   (Nodding.)

S.A. 123-24. The transcript reads, "rainbow," but the context shows that Diante was saying "limo." That was the conclusion of Dr. Robert Galatzer-Levy, a child psychiatrist who conducted a thorough competency assessment of Diante six months after trial. See S.A. 141. ("[H]is pronunciation of the word 'limo' was difficult for this evaluator to understand; I initially believed he was saying something like 'lambo.'").

As for the "heaven" reference, during Dr. Galatzer-Levy's evaluation, Diante described a church as a "church with heaven" and a courtroom as a "church with the judge." *Id.* That would be consistent with the rest of Diante's testimony on the subject at the competency hearing, in which he said that other *living* family

members were present "in heaven" in an exchange that took on great importance for the judge:

Q   Who else was in heaven with him?

A   My brother and my cousin.

Q   Okay. What's your brother's name?

A   Junior.

Q   Okay. And he was there, too?

A   (Nodding.)

Q   And did you talk to Jaquari then?

A   Uh-huh.

Q   Did he say anything to you?

A   Yes.

Q   What did he say to you?

A   He—He said, my mommy killed my brother, and my mommy didn't.

Q   Okay. Now, I want to ask you a little bit about your bedroom . . . .

S.A. 124-25. Because this account involves both of Diante's brothers, we cannot be completely certain whether the "He" in the penultimate line refers to Junior or to Jaquari. The difference bears on both the competency determination and Harris's guilt or inno-cence. If the speaker was Junior, Diante was describing what his surviving brother Junior had told him at the wake or funeral: Junior said that Harris had killed Jaquari, and Diante was telling the judge that was

wrong. The testimony is entirely different if Diante meant that Jaquari appeared to his brothers from beyond the grave to accuse their mother of killing him. The first reading is supported by the fact that Diante said, "He said, my mommy killed *my brother*," not "He said, my mommy killed *me*," or "He said, my mommy killed *him*." The best support for the second reading is that Jaquari was the brother the prosecutor had last mentioned (three questions earlier), but it's safe to say that six-year-old Diante was not precise with pronouns and antecedents. Given the ambiguity, one would have expected counsel or the court to ask some follow-up questions to learn what Diante meant, at least before assuming that he was reporting a visit from beyond the grave. But nothing more was said on the subject. And not only did the court assume that this testimony referred to a communication with Jaquari's spirit, but it relied heavily on his report of this supposed "fantasy" to find that Diante was not competent to testify.

At the close of Diante's testimony, the court asked him: "did you — anyone tell you what you should say here when you got to court?" Diante said "No." "Have you spoken before with any of the people who are here today before you came to court?" Diante again answered "No." S.A. 131.[3] Then, the following final exchange took place between the judge and Diante:

---

[3]  Apparently, Diante had spoken with the prosecutor. Dkt. 1-17 at 92. Defense counsel had also spoken to Diante, but "that was actually here at court . . . prior to [his] taking the stand." *Id*. at 94.

Q    Diante, you [told] me you remember playing
     Spiderman in your bedroom with your brother, is
     that right?

A    Yes.

Q    Do you remember anything else that happened
     that day?

A    No.

Q    Nothing at all?

A    No.

Q    Okay. Anything further, Mr. Wright?

S.A. 132.

Following Diante's testimony, defense counsel said
that he wished to call Ale Levy, the investigator who
interviewed Diante the day after his brother's death. Levy
was not present at the courthouse, however. Defense
counsel said that he had subpoenaed Levy, but neither the
court nor the prosecutor was familiar with her. The
court asked, "have you made any effort to procure her
appearance here at this time, so as not to delay these
proceedings?" Dkt. No. 1-17 at 81. Defense counsel said
he had not. In response to the court's question about the
substance of Levy's expected testimony, defense counsel
said that she "actually interviewed Diante Dancy; and
asked him a lot of the same questions that was asked," and
"he was able to tell her, on that day, which is roughly 12,
15 hours after the event, exactly everything that hap-
pened." *Id.* at 82. The trial judge replied, "I'm not saying
it's not relevant. I'm just at a lack to find out what that

would be, in order to determine whether I would grant a continuance to get that witness here." *Id.* at 83. Counsel then said the defense had no further witnesses. The court confirmed that counsel was "not choosing to call that person at this time?" Counsel answered no.

The State then called Karen Wilson, the second investigator to interview Diante after Jaquari died. She testified that in her conversation with Diante, he stated that Scooby-Doo, Spiderman, and Santa Claus were real persons. Dkt. No. 1-17 at 86. She also said that Diante told her he was asleep when his brother got hurt. On cross-examination, Wilson agreed that Diante had said he did not see "mommy or daddy tie a sheet around Jaquari's neck." Dkt. 1-17 at 89.

The court heard oral argument. Defense counsel went first, contending that Jaquari *really was* in heaven, and that it was perfectly reasonable for a six-year-old to believe in Santa Claus and the tooth fairy, and that such beliefs did not affect his "ability to recall the facts on May 14th." Dkt. No. 1-17 at 98. Counsel concluded by saying "we believe that we've met our burden" showing that Diante was competent to testify. *Id.* at 100. The prosecutor argued that Diante was incompetent because of his "inability to differentiate between reality and fantasy with the Spiderman, Santa Claus, tooth fairy characters," and that he testified not just that he *believed* his brother was in heaven but that he "*saw* his brother in heaven." *Id.* at 101 (emphasis added). In rebuttal, defense counsel stated: "The only issue is that . . . he observed on that day Jaquari wrap the sheet around his

own neck. He knew where they were at, he knew who was present. That's the only issue that is relevant as relates to the information for him being called as a witness." *Id.* at 102.

The court ruled that Diante was incompetent. The judge began by saying: "Defense counsel misperceives what the issue is with regard to witness competency" because "a two month old baby could have been in the room and witnessed or observed what occurred, but that would not make them a competent witness if they're lacking other criteria." He acknowledged that Illinois had abolished age-based presumptions of incompetency and that the statute now provided for only two bases for disqualification: (1) inability to express oneself so as to be understood; or (2) inability to understand the duty of a witness to tell the truth. S.A. 85-86; see 725 ILCS 5/115-14. The court first addressed the second prong, saying: "I don't find any questions at all that were posed to the witness with regard to his understanding of any concept of a duty to tell the truth when presented in a courtroom." S.A. 87. Diante's testimony that "[y]ou get in trouble" for telling a lie and "[y]ou get a star" for telling a truth "gave the Court very little insight into whether or not Diante knows what is the truth and what is a lie or not true." S.A. 86. "The witness was never asked whether he would promise to tell the truth and what that might mean to him here in this proceeding." S.A. 88.

Turning to the first prong, the court said it had "considerable question as to that issue," identifying a number of

factors that cast doubt on Diante's ability to "perceive and remember events and to relate them." S.A. 88. First, Diante recalled "playing Spiderman" and "the aspect with the cord and the neck," but the court, referring to its own question at the end of his testimony, said Diante "remembers nothing else at all from that day." *Id.* Second, the court questioned whether Diante had the ability to distinguish between reality and fantasy:

> Diante is still at that point in his life . . . where the Court cannot say that he has moved through that youthful period or childhood period of fantasy with regard to still believing certain things to be real, whether it be Spiderman, who he says, he has met in person, the tooth fairy, Santa Claus. . . . He said, he met with his brother in heaven and his brother told him his mother killed him. I mean, that is not real. That is a fantasy.

S.A. 89-90. The court then concluded that Diante was incompetent to testify under either prong of the statute:

> And so I do believe at this point in time Diante lacks the ability to differentiate between reality and fantasy. And also, I believe he lacks the ability to recall the events of the date in question and to be able to communicate them effectively here in court under an understanding and acceptance of a duty to testify truthfully in this case. And again, it is not clear to this Court that even he understands to differentiate significantly between those two concepts, truthfulness and falsehood.

S.A. 90. Diante did not testify. The jury convicted Harris of first-degree murder.

D.  *Post-Conviction Proceedings*

With new counsel, Harris moved for a new trial. Her supplemental motion included four constitutional claims: (1) the court violated Harris's right to call witnesses in her own defense in deeming Diante incompetent to testify (Sixth Amendment right to compulsory process); (2) the evidence was insufficient to prove the *corpus delicti* element of murder (Due Process); (3) the court erred in denying her motion to suppress her confession (Fifth Amendment right against self-incrimination); and (4) trial counsel was ineffective (Sixth Amendment right to counsel). Her motion included Dr. Galatzer-Levy's competency assessment. He had concluded that Diante was "neither incapable of expressing himself concerning the events surrounding his brother's death, nor incapable of understanding the duty of a witness to tell the truth." S.A. 143.[4] Harris also submitted the interview notes of Child Advocacy Center investigator Ale Levy and affidavits from two expert witnesses on false confessions and pediatric asphyxiation.

---

[4] Dr. Galatzer-Levy wrote that Diante was "able to clearly articulate during my evaluation what he observed concerning the circumstances surrounding his brother's death," including that "'Jaquari killed his own self,' that Jaquari wrapped a sheet around his neck (indicating physically with his hands what he saw)" and that "Diante's mother and father were not in the room when this occurred." S.A. 139. Although Diante's sequencing of the events surrounding his brother's death was "sometimes confused," Dr. Galatzer-Levy said this was "typical of a child of Diante's age." *Id.*

The trial court denied Harris's motion for a new trial. In addressing the issue of Diante's competency hearing, the court conceded that it had erred in placing the burden of proof on Harris but held that it would have reached the same result even if the State had borne the burden. In his ruling from the bench, the trial judge said: "It was clear to the Court that [Diante] was in the world of a child. That he could not do those things that the law requires competent witnesses to do, so that was upon that basis that I found [Diante] not competent to testify, and that would have been the outcome or my finding regardless of whether I had articulated the correct burden of proof." S.A. 59. Aside from this vague, *post hoc* justification for its ruling and some recitation of the statutory language, the court did not elaborate on its ruling at trial that Diante was incompetent to testify. The trial court did not address Harris's Compulsory Process claim. The court sentenced Harris to 30 years in prison.

On direct appeal, the Illinois Appellate Court affirmed. *People v. Harris*, 904 N.E.2d 1077 (Ill. App. 2009). The panel majority held that: (1) the trial court did not abuse its discretion in finding Diante incompetent under Illinois's witness competency statute and that, even if it had, any error was harmless because Diante's testimony would not have influenced the verdict; (2) Dr. Denton's revised conclusion that Jaquari's death was a homicide was sufficiently independent to establish that a crime had occurred; (3) the motion to suppress was properly denied because Harris was not in custody during her initial, unwarned confession; and (4) Harris failed to

establish an ineffective assistance of counsel claim because "she suffered no prejudice from her counsel's purported deficiencies." *Id.* at 1098. One judge dissented, taking the view that Harris's confession should have been suppressed. *Id*. at 1100-02 (Tully, J., dissenting). Neither the majority nor the dissent said anything about Harris's Compulsory Process claim. The Supreme Court of Illinois denied Harris's petition for leave to appeal.

Harris filed a petition for habeas corpus under 28 U.S.C. § 2254, seeking relief on the same grounds she presented to the state courts. With the exception of the competency issue, the district court found reasonable the Illinois Appellate Court's adjudication of each of Harris's four claims. See *Harris v. Thompson*, No. 10 cv 6257, 2011 WL 6257143 (N.D. Ill. Dec. 14, 2011). As to the incompetency determination, the district court did not recognize that the state courts had neglected to reach Harris's Compulsory Process claim. Instead, it appears to have treated the state courts' denial of Harris's state evidentiary law claims as an adjudication of her Sixth Amendment claim, as well. The district court concluded that the appellate court unreasonably affirmed the trial judge on the basis of the competency statute's second prong (incomprehension of the duty to tell the truth), since the trial judge had said that he had heard no testimony on that question, and it was the State that bore the burden of proof. However, the appellate court had also affirmed the incompetency determination on the grounds of the first prong (inability to be understood), and the district court concluded that this ground for affirmance was reasonable because there was some evi-

dence on that issue. The district court also found reasonable the appellate court's conclusion that any error in disallowing Diante's testimony was harmless, and the court denied the petition for a writ of habeas corpus. Harris timely appealed. The parties agree that she has exhausted her state remedies and no procedural bar applies to any of the claims presented.

II. *Habeas Corpus Review Under 28 U.S.C. § 2254*

We have jurisdiction under 28 U.S.C. § 2253(a), and we review *de novo* the district court's denial of habeas corpus relief. See *Steffes v. Pollard*, 663 F.3d 276, 281 (7th Cir. 2011). The statutory authority of federal courts to issue a habeas writ for persons in state custody is § 2254, as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, a habeas petition may be granted only if a state court's ruling on a federal constitutional question "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2).

In applying this "difficult to meet . . . and highly deferential standard," *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks omitted), federal courts must avoid "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012), quoting *Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010). Rather,

"a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). Our review under § 2254(d) "is limited to the record that was before the state court." *Pinholster*, 131 S. Ct. at 1398.

AEDPA's deferential standard of review applies only to claims that were actually "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Where the state courts did not reach a federal constitutional issue, "the claim is reviewed *de novo*." *Cone v. Bell*, 556 U.S. 449, 472 (2009). When no state court has squarely addressed the merits of a habeas claim, "we review the claim under the pre-AEDPA standard of 28 U.S.C. § 2243, under which we 'dispose of the matter as law and justice require.'" *Toliver v. Pollard*, 688 F.3d 853, 859 (7th Cir. 2012), quoting *Morales v. Johnson*, 659 F.3d 588, 599 (7th Cir. 2011). The operative decision under review is that of the last state court to address a given claim on the merits. See *Greene v. Fisher*, 132 S. Ct. 38, 45 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006). In this case, that is the Illinois Appellate Court's decision in *People v. Harris*, 904 N.E.2d 1077 (Ill. App. 2009).

III.  *Compulsory Process Clause Claim*

  A.  *Standard of Review*

The Sixth Amendment guarantees the accused the right to "have compulsory process for obtaining wit-

nesses in his favor." As a threshold matter, we must determine whether AEDPA deference applies to this claim. The habeas petitioner clearly presented a federal constitutional claim to the state courts, which affirmed her conviction in a published opinion but did not explicitly address or even acknowledge the existence of the federal constitutional issue. In her brief to the state court, Harris alleged a deprivation of "her right to compulsory process under the Sixth Amendment of the U.S. Constitution and Article I, § 8 of the Illinois Constitution," cited the foundational Supreme Court case, *Washington v. Texas*, 388 U.S. 14 (1967), and other federal and state cases, and set forth the applicable constitutional standard. See Dkt. No. 1-5 at 42. Yet the state court analyzed the disqualification of Diante as a witness purely as an issue of state evidentiary law, reviewing the trial court's incompetency determination for an abuse of discretion and harmless error. See 904 N.E.2d at 1091-95. At the beginning of the relevant section of its opinion, the court acknowledged that Harris "assert[ed] that the trial court abused its discretion and *violated her constitutional rights* when it ruled that Diante Dancy was incompetent to testify." *Id.* at 1091-92 (emphasis added). But the appellate court never identified which constitutional rights were at issue or referred to the Compulsory Process Clause, the Sixth Amendment, or even the Due Process Clause. And the court cited no case — state or federal — on the constitutional issue.

The appellate court's silence on the issue fell below even the low threshold a state court decision must meet

to qualify as "on the merits" under AEDPA. The state court need not explain its reasoning in rejecting the petitioner's federal claim. See *Richter*, 131 S. Ct. at 784; see also *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005) ("AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court."). Nor must it cite or even be aware of any particular cases. See *Richter*, 131 S. Ct. at 784. Sometimes even saying nothing at all will suffice. In *Richter*, the Supreme Court held that the California Supreme Court's one-sentence summary order denying a prisoner's petition for state collateral relief was "on the merits" for AEDPA purposes: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 131 S. Ct. at 784-85. But that "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely," though there was no such reason in *Richter*. *Id.* at 785. Although the state supreme court's summary dismissal of post-conviction relief in *Richter* did not address the merits of the petitioner's federal constitutional arguments, "the state court did not say it was denying the claim for any other reason," such as a procedural default or other independent and adequate state-law ground. *Id.* at 784.

In this case, by contrast, we have ample reason to think some other explanation for the state court's deci-

sion is more likely — the very reasons the state court actually gave, which were all based on state evidence law, not federal constitutional law. The state court's decision on the incompetency ruling reached four legal conclusions. First, the trial court's "procedural error" in misallocating of the burden of proof was not "outcome-determinative" in the ultimate determination of incompetency. *Harris*, 904 N.E.2d at 1092. Second, the trial court did not "base[ ] its analysis on factors outside Illinois statutory law." *Id.* at 1093. Third, the trial court's "determination of incompetency" was not "unsupported by the record." *Id.* at 1094. Finally, even assuming that the trial court had erred in its ruling, the error had been "harmless beyond a reasonable doubt." *Id.* at 1094. In sum, the appellate court's adjudication rested entirely on Harris's claim of state evidentiary error. It did not hint at any federal (or state) constitutional ground of decision. The *Richter* presumption and AEDPA deference therefore do not apply. See *Sussman v. Jenkins*, 642 F.3d 532, 534 (7th Cir. 2011) (Ripple, J., in chambers) (denying motion to stay mandate and concluding that *Richter* presumption was inapplicable where state appellate court issued an opinion but did not address the constitutional question); see also *Sussman v. Jenkins*, 636 F.3d 329, 350 (7th Cir. 2011) (underlying opinion).

This also is not a case where an earlier state opinion "fairly apppear[s] to rest primarily upon federal law," but a later one is silent or cryptic. See *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), quoting *Coleman v. Thompson*, 501 U.S. 722, 740 (1991). In that situation, the federal habeas court "'looks through' [the later decision] to the

last reasoned decision" and treats the later one as reaching the merits if the earlier one did. *Ylst*, 501 U.S. at 805. In this case neither the state appellate court nor trial court mentioned Harris's compulsory process claim. When we look for the "last *explained* state-court judgment" on Harris's Sixth Amendment right to present a defense, we do not find one. No state court has actually decided it.

It follows from the Supreme Court's AEDPA jurisprudence that where a state court overlooks a constitutional claim that was fairly presented to it, federal review is *de novo*. In *Cone v. Bell*, 556 U.S. 449 (2009), the state post-conviction court *deliberately* bypassed a federal claim because it believed — erroneously — that the state courts had already addressed it on direct appeal. Because the state courts therefore never reached the merits of the *Brady* claim, the Supreme Court reviewed the issue *de novo. Id.* at 472. *Cone* shows that when the state court knowingly (but mistakenly) declines to address a constitutional claim, AEDPA deference does not apply. It would be odd, then, if AEDPA deference did apply when the state court's decision simply overlooked the constitutional issue, as happened here.

This case is also analogous to the relatively common situation in which the state courts address one prong of the two-prong *Strickland v. Washington* test for ineffective assistance of counsel, but not the other. In that situation, federal courts apply AEDPA deference to the prong the state courts reached but review the unaddressed prong *de novo. E.g., Rompilla v. Beard*, 545 U.S. 374, 390

(2005) (*de novo* review where state courts did not reach prejudice prong); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (same); see also *Sussman*, 636 F.3d at 350 (applying *Rompilla/Wiggins* rule after *Richter*); accord, *Toliver v. Pollard*, 688 F.3d 853, 857 (7th Cir. 2012) (same); *Hooks v. Workman*, 689 F.3d 1148, 1188 (10th Cir. 2012) (same); *Foster v. Wolfenbarger*, 687 F.3d 702, 709 (6th Cir. 2012) (same); *Johnson v. Sec'y, DOC*, 643 F.3d 907, 930 (11th Cir. 2011).

Here, the state courts simply have not addressed the federal constitutional issue. When that happens, federal habeas review must be *de novo* for there is no state court judgment to which we could defer. See, *e.g.*, *Fenenbock v. Dir. of Corrections*, 681 F.3d 968, 978 n.12 (9th Cir. 2012) ("No deference is due to the last reasoned state court opinion because it failed to address the constitutional question, resolving the claim only on state evidentiary grounds."); accord, *Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012), petition for cert. filed (U.S. July 18, 2012) (No. 12-5374); *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012); *Clements v. Clarke*, 592 F.3d 45, 55 (1st Cir. 2010).[5]

---

[5] In some cases, perhaps, the state court's analysis of state law may be substantively co-extensive with the federal constitutional issue. See, *e.g.*, *Childers v. Floyd*, 642 F.3d 953, 970, 971 n.19 (11th Cir. 2011) (en banc) (concluding that AEDPA deference applied to review of Confrontation Clause claim because state court's disposition under state evidentiary law in effect "addressed the Confrontation Clauses's concerns," which

(continued...)

AEDPA requires federal courts to accord substantial deference to state court adjudications of federal constitutional claims. Such deference is "part of the basic structure of federal habeas jurisdiction," which is "designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions" and to honor "the State's significant interest in repose for concluded litigation." *Richter*, 131 S. Ct. at 787, quoting *Harris v. Reed*, 489 U.S. 255, 282 (1989) (Kennedy, J., dissenting). Where the state courts have overlooked a constitutional claim, however, these comity and finality concerns have less force. In the absence of a state decision on the merits, our review is "not circumscribed by a state court conclusion" on the issue. *Wiggins*, 539 U.S. at 534. The Illinois courts did not adjudicate Harris's Compulsory Process Clause claim "on the merits," so our review is *de novo*.[6]

---

(...continued)

"did not slip the [state] court's collective mind"), petition for cert. filed, (U.S. July 6, 2011) (No. 11-42). In this case, we need not decide that difficult issue, for there is no colorable argument that the Illinois Appellate Court effectively addressed the Compulsory Process Clause issue when it decided that the trial court did not abuse its discretion in finding Diante incompetent to testify. The constitutional implications of the competency ruling were simply overlooked.

[6] Even if this court were to indulge the presumption that the Illinois courts actually adjudicated the Compulsory Process claim "on the merits," the outcome of our review would be

(continued...)

B.  *The Constitutional Standard*

The Compulsory Process Clause, which provides that the accused shall have the right "to have compulsory process for obtaining witnesses in his favor," together with the Due Process Clause of the Fourteenth Amendment, embodies a substantive right to present a meaningful and complete criminal defense. See *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). "The right to offer the testimony of witnesses, and to compel their attendance, . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "Few rights are more fundamental than that of an accused to present witnesses in his own defense," *Taylor*, 484 U.S. at 408 — a right Chief Justice Marshall described as "sacred." *United States v. Burr*, 25 F. Cas. 30, 33 (C.C.D. Va. 1807). The compulsory process right is an "essential attribute of the adversary system itself," *Taylor*, 484 U.S. at 408, and "imperative to the function of the courts," which "depend on full disclosure of all the facts, within the framework of the rules of evidence." *United States v. Nixon*, 418 U.S. 683, 709 (1974).

---

[6] (...continued)

no different. For the reasons described below, the state court's harmless error analysis (which would stand as a proxy for, at least, the materiality prong of the constitutional issue) would be both an unreasonable determination of facts and an unreasonable application of law in the instant case.

Of course, the right is not unlimited. The defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). The accused "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410. While a "trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor," the "countervailing public interest[ ]" in the "integrity of the adversary process, which depends both on the presentation of reliable evidence and rejection of unreliable evidence, . . . must also weigh in the balance." *Id.* at 414, 415. Thus, the Compulsory Process Clause does not require criminal courts to admit evidence that is irrelevant, *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986), testimony by persons who are mentally infirm, see *Washington*, 388 U.S. at 23 n.21, or evidence that represents a half-truth, see *United States v. Nobles*, 422 U.S. 225, 241 (1975).

On the other hand, the exclusion of defense evidence "abridge[s] an accused's right to present a defense" where the restriction is "'arbitrary' or 'disproportionate to the purposes' [it is] designed to serve," and the evidence "implicate[s] a sufficiently weighty interest of the accused." *United States v. Scheffer,* 523 U.S. 303, 308-09 (1998), quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987). For example, the Supreme Court has struck down under the Compulsory Process Clause a rule against introducing the testimony of an alleged accomplice, *Washington*, 388 U.S. at 22-23; an application of the

hearsay bar to statements that "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability," *Chambers*, 410 U.S. at 300; the exclusion of evidence bearing on the credibility of a voluntary confession, *Crane*, 476 U.S. at 688-91; and a *per se* rule excluding all post-hypnosis testimony, *Rock*, 483 U.S. at 56-62. The Court has acknowledged the "power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane*, 476 U.S. at 690. But it simultaneously observed that the "opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence." *Id.*

The applicable constitutional standard is this: to establish that her right to compulsory process was violated by the exclusion of Diante's testimony, Harris must show that (1) the testimony would have been "both material and favorable" to her defense, *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982), and (2) that the exclusion was "arbitrary" or "disproportionate" to the evidentiary purpose advanced by the exclusion, *Scheffer*, 523 U.S. at 308, quoting *Rock*, 483 U.S. at 56. We conclude that Harris has made each showing.[7]

---

[7] Several other circuits have applied equivalent standards for adjudicating Compulsory Process claims. See, *e.g.*, *Jackson v.*
(continued...)

1.  *Material and Favorable to the Defense*

In *Valenzuela-Bernal*, the Supreme Court imported the materiality requirement of the *Brady v. Maryland* line of cases into the Compulsory Process Clause analysis. Under this standard, the exclusion of a witness is material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the

---

(...continued)

*Nevada*, 688 F.3d 1091, 1096 (9th Cir. 2012) ("Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is 'arbitrary or disproportionate to the purposes [the exclusionary rule is] designed to serve.'"), quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *United States v. Hardy*, 586 F.3d 1040, 1045 (6th Cir. 2009) (to determine whether exclusion of defense evidence violated right of accused to present a defense, courts first "weigh a defendant's Compulsory Process Clause rights against . . . countervailing public interests" and then examine "whether the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did not otherwise exist") (internal quotation marks and brackets omitted); *Gov't of Virgin Islands v. Mills*, 956 F.2d 443, 446 (3d Cir. 1992) ("[F]or Mills to establish that he was convicted in violation of his Sixth Amendment right to compulsory process, he must show: First, that he was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have been material and favorable to his defense; and third, that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose."), citing *Rock*, 483 U.S. at 56.

trier of fact." *Valenzuela-Bernal*, 458 U.S. at 874 (government's deportation of defense witness did not violate Sixth Amendment because defendant did not show a reasonable probability that he would not have been convicted if the witness had testified). This materiality standard is also identical to the one used to determine whether ineffective assistance of counsel is "prejudicial" under *Strickland*. See 466 U.S. at 694. (This equivalence between the two standards is helpful when we address Harris's *Strickland* claim in Part IV, below.)

Let's first consider what Diante's testimony would have been. It is undisputed that Diante was in the room when Jaquari died and that his account was entirely exculpatory to Harris. He would have testified that he saw Jaquari wrap the elastic band around his own neck, that his mother was not in the room when this happened, that Jaquari vomited in his "sleep," and that he saw a bubble form on Jaquari's mouth. This was all consistent with the physical evidence. Indeed, the medical examiner had initially concluded that the cause of death was self-asphyxiation. It was also consistent with Sta-Von Dancy's testimony that Jaquari had wrapped the elastic band around his own neck on previous occasions and that a mucus bubble had formed when Dancy found Jaquari lying unconscious. No other witness testified to what actually happened in the moments before Jaquari died. As the trial court itself acknowledged, Diante's testimony was "critical" to the defense. See S.A. 90-91. The testimony was new, favorable, and not cumulative.

Diante's testimony was also material. It is reasonably likely it would have significantly altered the balance of evidence to tip the scales in Harris's favor. The analogy to *Brady* helps show why. Imagine for a moment that the prosecutor in Harris's case had withheld from the defense the fact that Diante had told police investigators that he saw Jaquari strangle himself with the sheet's elastic band. And imagine the prosecution's evidence is the same as it was at trial: no other eyewitness contradicts Diante and says that Harris did it, and no physical evidence implicates Harris in Jaquari's death. "If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness." *United States v. Agurs*, 427 U.S. 97, 113 n.21 (1976), quoting Victor Bass, Comment, *Brady v. Maryland and The Prosecutor's Duty to Disclose*, 40 U. Chi. L. Rev. 112, 125 (1972). *A fortiori*, if the prosecution failed to disclose the existence of the case's *only* eyewitness, whose testimony is unique, exculpatory, and uncontradicted, the suppression would clearly be material. In such a case, the *Brady* violation would be obvious. Cf. *Smith v. Cain*, 132 S. Ct. 627, 630-31 (2012) (finding *Brady* violation in prosecution's failure to disclose police notes that impeached only eyewitness).

*Smith* shows that impeachment of the inculpatory testimony of the only eyewitness is material to an accused's defense. It follows that an undisclosed *exculpa-*

*tory* statement of the only eyewitness is certainly material as well. Cf. *Kyles v. Whitley*, 514 U.S. 419, 429 (1995) (holding that State's suppression of evidence that would have enabled impeachment of the government's best witness violated *Brady* where the "heart of the State's case was eyewitness testimony"). As the Supreme Court has made clear, "the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions." *Strickler v. Greene*, 527 U.S. 263, 290 (1999), citing *Kyles*, 514 U.S. at 434-35. Rather, the question is whether the "favorable evidence . . . 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Cone*, 556 U.S. at 470, quoting *Kyles*, 514 U.S. at 435. Had the prosecution in this case withheld Diante's statements to authorities that Jaquari had asphyxiated himself, it would require reversal of Harris's conviction under *Brady*.

Diante's testimony is also material under the Compulsory Process Clause, for the same standard applies. The trial court's disqualification of Diante deprived Harris of direct evidence from the sole eyewitness. This evidence was central to her theory of the case — that Jaquari's death was a tragic accident. No other witness replicated Diante's testimony. And no other witness contradicted Diante's account at trial; only the medical examiner supported the prosecution's theory that the Jaquari's death was even a homicide, and Dr. Denton admitted that this was a revised opinion. Diante's testimony was at least as valuable to Harris's defense as

were the undisclosed statements from the State's eye-witness in *Smith v. Cain*, and it was just as likely to cast "the whole case in such a different light as to undermine confidence in the verdict." *Cone*, 556 U.S. at 470, quoting *Kyles*, 514 U.S. at 435.

In its harmless error analysis of the state evidentiary issue, the Illinois Appellate Court wrote that "the proposed testimony of Diante was [not] likely to have [had] any significant impact upon the strength of the State's case" because of the "inherent weakness in the Diante proffer." *Harris*, 904 N.E.2d at 1094. The only value to Diante's testimony, the court found, was the "observation of Jaquari wrapping an elastic band around his neck." *Id.* But the court saw this testimony as not particularly important because "jurors had learned from other witnesses that Jaquari had done such things before." *Id.* And the force of Diante's account would have been "negated or otherwise diminished by Diante's admission to Ms. Wilson," who interviewed him two days after the death, "that 'he was asleep when his brother got hurt.'" *Id.* at 1095. (Diante also told Ale Levy, who interviewed him the day before Wilson, that he was "asleep when Jaquari died.")

We respectfully find this analysis to lack merit. Diante's testimony that he saw his brother wrapping the very instrument of death around his neck just before he died is far more relevant than Dancy's testimony that Jaquari had wrapped the band around his neck on some previous occasions. Evidence is cumulative when it "goes to prove what has already been established by

other evidence." *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012), quoting *Smith v. Sec'y of New Mexico Dep't of Corrections*, 50 F.3d 801, 829 (10th Cir. 1995); see also *Arizona v. Fulminante*, 499 U.S. 279, 299 (1991). None of the other defense witnesses came close to Diante in terms of their exculpatory value. Diante's testimony would not have been cumulative.

Nor does Diante's "admission" to Wilson that he was asleep when Jaquari died significantly reduce the probative force of his testimony. At most, it suggests that Diante, like many children, did not fully comprehend the concept of death and that, heartbreakingly, he may well have watched his brother die without realizing it. See Mark W. Speece & Sandor B. Brent, *Children's Understandings of Death: A Review of Three Components of a Death Concept*, 55 Child. Dev. 1671, 1679 (1984) (studies show that children acquire some understanding of conceptual components of death between ages five and seven, with "wide range of ages of acquisition" observed). Diante believed Jaquari fell "asleep" with the mucus bubble, and only later was he informed of Jaquari's death. Given Diante's age, a reasonable jury would understand perfectly well what was going on here. At worst, Diante's "admission" to being asleep created a superficial tension with his earlier (and unambiguous) report that he saw Jaquari wrap the elastic around his own neck and that his mother was not present. At trial, the prosecution could certainly have explored that tension and the jury may have considered it in evaluating his testimony. But the idea that this would have "negated" the rest of his testimony is groundless. By

excluding Diante's testimony altogether, the trial court denied Harris the opportunity to present the strongest evidence of her innocence and impeded the jury in its search for truth. The appellate court minimized the significance of this exclusion by pointing to Diante's ambiguous "admission" and seizing on the most favorable interpretation to the prosecution. That is not how harmless error review works, and it is not how our materiality analysis proceeds under the Compulsory Process Clause. That inquiry asks whether the exclusion of the evidence had a reasonable probability of affecting the outcome of trial, and the disqualification of Diante did.

The State argues also that Diante's testimony, even if credited, would not have made a difference because the evidence against Harris was "overwhelming." Exculpatory evidence may be inconsequential to the outcome of the trial "if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith*, 132 S. Ct. at 630, citing *Agurs*, 427 U.S. at 112-13. But that is certainly not this case. The prosecution presented no physical evidence that linked Harris to Jaquari's death. The medical examiner initially concluded that Jaquari's death was a "tragic accident." The testimony of Dancy, the only person present at the apartment aside from the accused and the two children, supported Harris's account.

The prosecution's case rested entirely on Harris's videotaped confession. To be sure, a "voluntary confession" is "highly probative evidence." *Oregon v. Elstad*, 470 U.S. 298, 312 (1985); see also *Fulminante*, 499 U.S. at 296 ("A

confession is like no other evidence."). But a confession is not incontrovertible evidence of guilt. See *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).[8] Nor does a confession guarantee a guilty verdict.[9] Not all confessions are equally probative. See *Crane*, 476 U.S. at 691 ("evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility"); *Smith v. United States*, 348 U.S. 147, 153 (1954) ("[T]hough a statement may not be 'involuntary' . . . , still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation — whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past."). Simply because a confession is in evidence does not make every violation of the accused's

---

[8]  See also Innocence Project, False Confessions & Recording of Custodial Interrogations, http://www.innocenceproject.org/ Content/False_Confessions__Recording_Of_Custodial_ Interrogations.php (last visited Oct. 12, 2012) ("Over 25 percent of the more than 290 wrongful convictions overturned by DNA evidence in the U.S. have involved some form of a false confession.").

[9]  See, *e.g.*, *Ben-Yisrayl v. Davis*, 245 F. Supp. 2d 960, 961 (N.D. Ind. 2002) ("Peterson was tried twice in Lake County for three of the murders and was acquitted in those two trials, despite his confession."); *Johnson v. Village of Riverdale*, 192 F. Supp. 2d 874, 875 (N.D. Ill. 2002) ("Johnson — even though innocent — confessed falsely to the murder. . . . Despite the bogus 'confession,' Johnson was acquitted of all charges . . . .").

constitutional rights *ipso facto* a harmless error.[10] Conversely, even a coerced confession may be harmless when the other evidence of guilt is "overwhelming," *Fulminante*, 499 U.S. at 294-95 (White, J., dissenting), although that situation is rare in the absence of a separate and voluntary admission by the defendant.[11]

Here, we do not ask whether Diante's testimony would have overwhelmed the probative value of Harris's videotaped confession, nor even whether the jury would more probably than not have credited Diante's eyewitness account over the confession. An appellate court does not engage in such apples-to-oranges evidentiary comparisons. Our task is simply to ask whether, if Diante had testified, there is a reasonable probability the jury would have returned a different verdict.

We are confident that the answer is yes. The videotaped confession was powerful evidence, but the jury had reasons to question its reliability, too — reasons in line with leading research on false confessions. The jury knew the confession was the product of interrogation

---

[10] See, *e.g.*, *Brown v. Dugger*, 831 F.2d 1547, 1554-55 (11th Cir. 1987) (granting writ; violation of Confrontation Clause and prosecutorial comment on defendant's silence were not harmless despite confession).

[11] See, *e.g.*, *United States v. Thompson*, 286 F.3d 950, 962 (7th Cir. 2002) (finding harmless error where "the government presented overwhelming evidence of the defendants' guilt," and where "to the extent the [inculpatory] statements were important, they were cumulative").

stretching over 27 hours at the police station. Cf. Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & Hum. Behav. 3, 16 (2010) (noting that "false confessions tend to occur after long periods of time" and "sleep deprivation is historically one of the most potent methods used to . . . extract confessions"). The jury knew Harris did not have an attorney present during this questioning and that, as a mother who had just lost her son, she was under stress and stricken with grief. Cf. Gisli H. Gudjonsson et al., *Custodial Interrogation, False Confession and Individual Differences: A National Study Among Icelandic Youth*, 41 Personality & Individual Differences 49, 56 (2006) (finding that depressed mood is linked to a susceptibility to provide false confession to police). The jury knew that Harris's initial, unwarned confession was inconsistent with the physical evidence — she said she had used the telephone cord. Only in later confessions (and after many more hours of interrogation) did she correct this curious discrepancy. See Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1087 (2010) ("The vast majority of these exonerees made statements in their interrogations that were contradicted by crime scene evidence, victim accounts, or other evidence known to police during their investigation.").[12] The jury also heard Harris testify that she

---

[12] See generally Richard A. Leo, *False Confessions: Causes, Consequences, and Implications*, 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009) ("Interrogators help create the false confession

(continued...)

had spent a sleepless night handcuffed in the interrogation room and that the police had threatened her, pushed her, called her names, and deprived her of food, water, and access to the bathroom, though she had said otherwise in the recorded confession.

These warning signals were not enough to overcome the videotaped confession at trial. But they might well have been enough if the jury had considered them along with Diante's testimony, which would have changed the entire tenor of the defense case. The theory of accidental death would have been buttressed by an actual eyewitness — the only person, according to the defense, who was present when Jaquari died. Such testimony "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Cone*, 556 U.S. at 470, quoting *Kyles*, 514 U.S. at 435. In this light, the circumstances of Harris's interrogation and the possibility of a false confession

---

(...continued)

by pressuring the suspect to accept a particular account and by suggesting facts of the crime to him, thereby contaminating the suspect's postadmission narrative. . . . If the entire interrogation is captured on audio or video recording, then it may be possible to trace, step by step, how and when the interrogator implied or suggested the correct answers for the suspect to incorporate into his postadmission narrative."); accord, Steven A. Drizin & Beth A. Colgan, *Let the Cameras Roll: Mandatory Videotaping of Interrogations Is the Solution to Illinois' Problem of False Confessions*, 32 Loy. U. Chi. L.J. 337, 339-41 (2001).

may well have given the jury greater pause. In sum, Diante's testimony was significant enough to be reasonably likely to have changed the outcome of the trial. Diante's testimony would have been material and favorable to Harris's defense.

2.  *Arbitrary or Disproportionate*

The second part of the constitutional question is whether the disqualification of Diante as a witness was arbitrary or disproportionate to the evidentiary interests advanced by the exclusion. The Supreme Court has had only limited occasions to deal in detail with the arbitrary or disproportionate prong of Compulsory Process Clause analysis. One pattern that has emerged is the "parity" principle: a state rule that restricts the presentation of testimony for the defense but not the prosecution will generally be deemed arbitrary. See Akhil Reed Amar, *Sixth Amendment First Principles*, 84 Geo. L. J. 641, 699 (1996). As Professor Amar noted, "the Court has repeatedly struck down asymmetric witness rules, and noted the asymmetry." *Id.* at 700, citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 & n.14 (1987) (distinguishing between symmetric and asymmetric privileges in due process analysis); *Green v. Georgia*, 442 U.S. 95, 97 (1979) (invalidating, on due process grounds, exclusion of hearsay statement that defendant sought to introduce where government introduced same statement in another criminal proceeding); *Cool v. United States*, 409 U.S. 100, 103 n.4 (1974) (rejecting as "fundamentally unfair" an instruction telling jury it could

convict solely on basis of accomplice testimony but not telling jury it could acquit solely on this basis, where defendant put accomplice on the stand); *Chambers v. Mississippi,* 410 U.S. 284, 295-98 (1973) (invalidating, under Due Process Clause, verdict where defendant was barred from impeaching his own witness while government was free to impeach that witness); *Webb v. Texas*, 409 U.S. 95, 96, 98 (1972) (per curiam) (trial judge intimidated sole witness for defense but not prosecution witnesses); *Washington v. Texas,* 388 U.S. 14, 22 (1967) (accomplices were allowed to testify for government but not for defendants); see also *id.* at 24-25 (Harlan, J., concurring in the judgment) (stressing this fact).

At first glance, the trial court's disqualification of Diante looks like an asymmetric application of Illinois's witness competency statute. Under the statute, all witnesses are to be presumed competent, and the party opposing competency has the burden to prove that either of the two prongs of the statute applies. In the usual case involving child witnesses, it is the prosecution offering the testimony, often from a victim of sexual abuse. In such cases the defense bears the burden of proof, and Illinois courts have often allowed very young children to testify.[13] Here, however, where the

---

[13] See, *e.g., People v. Mulvey*, 853 N.E.2d 68, 70 (Ill. App. 2006) (five-year-old with mental retardation found competent to testify for prosecution); *People v. Sutherland*, 743 N.E.2d 1007, 1013-14 (Ill. App. 2000) (six-year-old competent to testify for prosecution); *People v. DeWeese*, 698 N.E.2d 554, 559 (Ill. App.

(continued...)

*defense* offered the child witness's testimony, the trial court placed the burden on Harris to establish that Diante was competent. If this procedural decision reflected an actual rule in Illinois, it would certainly violate the Compulsory Process Clause.

Of course, that is *not* the rule in Illinois. The trial judge did not say that it was Harris's burden to prove competency because she was the defendant; he simply forgot about the presumption of competency in general. This case therefore does not involve a formally asymmetric evidentiary rule but rather the potentially arbitrary or disproportionate *application* of a facially neutral rule.

To deal with that issue, precedents from the Supreme Court, this court, and other circuits teach that we should apply a balancing test, weighing the value of the excluded evidence to the criminal defendant against the state's legitimate interests in the criminal trial

---

(...continued)
1998) (same); *People v. Smith*, 604 N.E.2d 858, 871-72 (Ill. App. 1992) (four-year-old competent to testify for prosecution); *People v. Mitchell*, 576 N.E.2d 78, 83-84 (Ill. App. 1991) (same); *People v. Hoke*, 571 N.E.2d 1143, 1148 (Ill. App. 1991) (two six-year-olds competent to testify for prosecution); *In re A.M.C. III*, 500 N.E.2d 104, 106-07 (Ill. App. 1986) (five-year-old competent to testify for prosecution); *People v. Epps*, 493 N.E.2d 378, 380 (Ill. App. 1986) (six-year-old competent to testify for prosecution); *In Interest of E.S.*, 495 N.E.2d 1334, 1335-36 (Ill. App. 1986) (five-year-old competent to testify for prosecution); *People v. McNichols*, 487 N.E.2d 1252, 1255-56 (Ill. App. 1986) (same).

process that are implicated by the exclusion. See *Chambers*, 410 U.S. at 295; see also *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) ("While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote . . . the Constitution permits judges 'to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'") (internal citations and some internal quotation marks omitted), quoting *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986). In *Crane*, for example, the Supreme Court addressed the state trial court's ruling that the accused could not testify about the coercive circumstances of his confession because it would have amounted to a relitigation of voluntariness, an issue the court had already decided in the prosecution's favor. 476 U.S. at 685-87. The Court held that this limit on the defendant's testimony violated his right "to present a complete defense." *Id.* at 690, quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). While acknowledging the power of state trial courts "to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability," *id.*, such interests could not justify the exclusion of the defendant's testimony about the circumstances under which the police secured his confession. "In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to" present a complete defense. *Id.*

The *Crane* Court reached its conclusion based on two considerations: the importance of the evidence to the defendant, and the lack of a legitimate state interest in excluding the testimony. The case indicates that to determine whether a particular evidentiary exclusion is arbitrary or disproportionate to the interests served, the proper approach is to weigh the defendant's interest in the evidence against the state's legitimate interests in promoting "fairness and reliability" in criminal trials. See *id.*; see also *Taylor v. Illinois*, 484 U.S. 400, 416-18 (1988) (using a balancing approach to determine whether exclusion of evidence as discovery sanction violated criminal defendant's compulsory process right); *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam) (holding that exclusion of testimony that mitigated defendant's role in crime was violation of due process "[r]egardless of whether the proffered testimony comes within Georgia's hearsay rule" because it "was highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability") (internal citations omitted).[14]

---

[14] Our own precedents also support a balancing approach to "arbitrary or disproportionate" analysis under the Compulsory Process Clause. See, *e.g.*, *Stephens v. Miller*, 13 F.3d 998, 1002 (7th Cir. 1994) (en banc) ("A criminal defendant's right to testify, however, is not unlimited and may bow to accommodate other legitimate interests in the criminal trial process. . . . Restrictions imposed by rape shield statutes, especially as they relate to a criminal defendant's right to testify, may not, how-

(continued...)

As we have explained, Diante's testimony in this case was critical and would have been new, exculpatory, non-cumulative, and uncontradicted. As in *Crane*, Harris's (disavowed) confession made Diante's testimony "all but indispensable to any chance of [Harris's defense] succeeding." See 476 U.S. at 691. Against Harris's substantial interest in this testimony, we must weigh the legitimate state interests in safeguarding the trial process against evidence that is "'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Id.*

---

(...continued)

ever, be arbitrary or disproportionate to the purposes they are designed to serve. Rather, the state is required to evaluate whether the interests served by the rule justify the limitation imposed on the criminal defendant's right to testify.") (citations omitted); *id.* at 1005 (Flaum, J., concurring) ("Whether a state interest can justify a limitation upon a defendant's right to present relevant evidence depends upon the relative weights of the interest and the evidence."); *id.* at 1020 (Ripple, J., dissenting) ("The more critical the excluded evidence to the defense of the accused, the more important must be the asserted state interest."); accord *Cunningham v. Peters*, 941 F.2d 535, 538-39 (7th Cir. 1991); *Johnson v. Chrans*, 844 F.2d 482, 484-85 (7th Cir. 1988). Other circuits are in accord. See, *e.g.*, *Ellis v. Mullin*, 326 F.3d 1122, 1128-30 (10th Cir. 2002); *Wood v. Alaska*, 957 F.2d 1544, 1551-54 (9th Cir. 1992). A detailed scholarly treatment of the Compulsory Process Clause also endorses a balancing test. See Robert N. Clinton, *The Right to Present a Defense: An Emergent Constitutional Guarantee in Criminal Trials*, 9 Ind. L. Rev. 711, 797 (1976).

at 689-90, quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Of course, competency requirements serve legitimate and important state interests. But it is not enough that Illinois's competency rule serves legitimate state interests in general. The Compulsory Process Clause demands more particularized scrutiny of the application of the rule in each case. In *Chambers*, 410 U.S. 284 (1973), the defendant was on trial for murdering a police officer and offered the testimony of three witnesses who heard another man admit to being the real killer. The trial court excluded the evidence on the ground that it was hearsay. (Mississippi did not at that time recognize a hearsay exception for an admission against penal interest.) The Supreme Court reversed Chambers's conviction, holding that the state courts unconstitutionally restricted Chambers's right to present witnesses in his own defense. The Court acknowledged the legitimacy of the hearsay rule as an important rule of evidence "designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* at 302. But "[i]n these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*

*Chambers* shows that "if the defendant tenders vital evidence the judge cannot refuse to admit it without giving a better reason [than] that it is hearsay." *Rivera v. Director, Dep't of Corrections*, 915 F.2d 280, 281-82 (7th Cir. 1990). In *Rivera*, the defendant and his co-con-

spirator were tried separately. The co-conspirator had confessed and his confession contained statements that were exculpatory to Rivera. The confession was excluded as hearsay and Rivera was convicted. Applying *Chambers*, we granted habeas relief: "the exclusion of [the co-conspirator's] confession from Rivera's trial was arbitrary, because the state has offered no plausible reason for believing that the exculpatory portion of the confession was so unreliable as to justify denying Rivera the right to introduce the only evidence of his innocence that he had." *Id.* at 283.

Witness competency laws advance the same truth-seeking interests as hearsay rules. They protect the integrity of the adversary process by excluding categorically testimony that is likely to be unreliable. See, *e.g.*, George Fisher, *The Jury's Rise as Lie Detector*, 107 Yale L.J. 575, 624-25 (1997) ("In effect, this panoply of competency rules preempted the jury's lie-detecting function by declaring certain witnesses to be likely liars as a matter of law."). When competency rules are applied reasonably, they may limit the right of an accused to call certain witnesses, even when they may be important to his defense. See *Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967) ("Nor do we deal in this case with nonarbitrary state rules that disqualify as witnesses persons who, because of mental infirmity or infancy, are incapable of observing events or testifying about them."). But the Compulsory Process Clause does not countenance evidentiary exclusions that sweep far more broadly than the interest in the integrity of trial would justify.

Under the Compulsory Process Clause balancing test, where the challenged witness is critical to the defense's case, the state must have some "plausible reason for believing that" the witness would be "so unreliable as to justify denying [the defendant] the right to introduce the only evidence of his innocence that he had." *Rivera*, 915 F.2d at 283; see also Peter Westen, *The Compulsory Process Clause*, 73 Mich. L. Rev. 71, 135 (1974) ("It would be unconstitutional, for example, to disqualify a child from testifying for the defense on the ground that he lacked a perfect memory, or that he lacked the ability to express himself as well as an English professor. To disqualify the child under such a standard would be unconstitutional for the same reason that it was improper to disqualify the accomplice in *Washington*: It prevents the jury from hearing a material witness for the defense whose testimony may well be reliable.").

In this case, Diante's competency hearing did not reveal that he was so unreliable as a witness as to justify depriving the defense of his uniquely exculpatory testimony. Diante indicated that he knew the difference between the truth and a lie and that one may be rewarded for telling the truth and punished for telling a lie. Illinois courts have repeatedly found that sufficient under Illinois law to show that a child witness understands the duty to tell the truth.[15] Diante also provided a fairly

---

[15] See, *e.g.*, *People v. Williams*, 891 N.E.2d 904, 932 (Ill. App. 2008) (nine-year-old found competent to testify even though he initially "responded in the negative to the State's question

(continued...)

coherent and highly relevant account of what had happened on the day of Jaquari's death: his brother wrapped the cord around his own neck, his parents had not been in the room, and Jaquari went to "sleep" when a "bubble" formed on his mouth. This was consistent with the physical evidence and with the account he gave to investigators in the days immediately following the death. Nothing suggested that Diante had fabricated the account or been coached. Although a few times it took additional questioning to draw out Diante's precise meaning, he was clearly not so incomprehensible as to have made his entire testimony inherently unreliable.

---

[15] (...continued) of whether he knew the difference between the truth and a lie," because he thereafter "displayed a threshold grasp of the difference between telling the truth and lying."); *People v. Dempsey*, 610 N.E.2d 208, 217-18 (Ill. App. 1993) (nine-year-old sexual abuse victim found competent to testify even though, when first questioned whether he knew the difference between a truth and a lie, he indicated that he did not; court found that boy's statement that if he told a lie he would "go to the devil" demonstrated his understanding that it was sinful and therefore wrong to tell a lie); see also *Sutherland*, 743 N.E.2d at 1013 (six-year-old shooting victim was found competent to testify even though she stated that "telling the truth made people 'happy' and lying made people 'mad,'" where she demonstrated having knowledge of the difference between telling the truth and lying by saying it was wrong to lie and that if she lied she would get a "'whopping'").

Diante was by no means a perfect witness. He said that he believed Santa Claus and Spiderman were real and that he had seen Jaquari "in heaven." He also told investigators Levy and Wilson that he had been asleep when Jaquari got hurt, which was superficially inconsistent with the defense's claim that Diante witnessed Jaquari's death. (Nobody asked him to explain the difference.) And he did not respond to the court's satisfaction to two of its questions: first, whether he could "remember anything else that happened that day" (he said no); and second, whether he had "spoken before with any of the people who are here today before you came to court." (Diante again said no, even though he had previously spoken to the prosecutor).

But none of these responses were explored by the court or counsel with even minimal follow-up. Had there been any, the court should have gained the same insights that Dr. Galatzer-Levy did: that Diante believed Santa and Spiderman were real to the extent they were not cartoons; that by "heaven," Jaquari probably meant "church"; that he did not realize that he witnessed Jaquari die because he did not understand death; and that he remembered many details from the day of Jaquari's death. Moreover, even if like many six-year-olds Diante believed that these mythical characters were real, such imaginings were not commingled with his memory of the day of Jaquari's death and would not

have hindered his ability to tell what he saw.[16]

The bigger issue, and the trial court's more glaring failure at the competency hearing, was its unrealistic expectations for a six-year-old witness. As Illinois courts have emphasized, "[i]t is not incumbent upon a child to give perfect answers to questions asked during the competency determination or at trial to be deemed a competent witness." *Williams*, 891 N.E.2d at 932, quoting *Sutherland*, 743 N.E.2d at 1013. A child's belief in Santa Claus or Spiderman does not make the child's testimony about his real-life experiences unreliable.[17] Nor does

---

[16] Even if Diante had truly believed he saw Jaquari "in heaven" (which, as we have noted, is an improbable interpretation of his testimony), having a spiritual vision is not a basis to disqualify a person as incompetent to testify. See Rodney Stark, *What Americans Really Believe* 48-60 (2008) (finding that 55% of Americans surveyed believed they have been protected from harm by a guardian angel and 45% believed they have had at least two mystical or religious experiences such as hearing the voice of God).

[17] Courts commonly find children competent to testify despite their expressed beliefs in Santa Claus and other fictitious characters. See, *e.g.*, *Hurt v. Commonwealth*, No. 2002-SC-0209-MR, 2003 WL 22417232, at *4 (Ky. Oct. 23, 2003) (six-year-old believed in Santa Claus); *State v. Anderson*, 798 N.E.2d 1155, 1167 (Ohio App. 2003) (recognizing that a four-year-old child's claim that she believed in Santa Claus and that she saw monsters did not negate her competency to testify because very young children "generally believe in such things as

(continued...)

Diante's negative response to the court's general inquiry if he remembered anything else from the day. Such a broad, open-ended question in a hearing or deposition often confuses adults who have already been testifying about what they remember. It was unlikely to elicit a detailed, substantive account of the day's events from a six-year-old, especially when posed by a stranger in a black robe. Likewise, the trial court's question, "Have

---

(...continued)

Santa Claus and the bogeyman and frequently play make-believe"); *Humphrey v. State*, 1999 WL 46541, at *3 (Alaska App. Feb. 3, 1999) (six-year-old believed in Santa Claus and the tooth fairy); *State v. Miller*, 2003 WL 22077677, at *5 (Wash. App. Sept. 9, 2003) ("Mr. Miller first contends [six-year-old] V.S. was not competent to testify because, when asked whether dinosaurs were real or cartoon, V.S. said that they were real. It is difficult to see how this response demonstrates any mental incapacity when fossil evidence establishes the previous existence of dinosaurs."); *Carmona v. State*, No. 05-96-01789-CR, 05-96-01790-CR, 1998 WL 304700, *3-4 (Tex. App. 1998) (five-year-old who believed his stuffed animal was a person and that cartoons were real). We have found only one case in which a court found a child was incompetent in part because she could not say that cartoon characters were make-believe. See *B.B. v. Commonwealth*, 226 S.W.3d 47 (Ky. 2007). In that case, the child was four at the time of the hearing, she "had no concept of a lie, nor the consequences of lying," and "when asked directly if she understood 'what telling the truth means' or 'what being honest is and telling exactly what happens' means, C.Y. shook her head 'no'." *Id.* at 49.

you spoken before with any of the people who are here today before you came to court?" was both compound and ambiguous enough that many adults might have trouble answering it. Was the judge asking whether Diante had *ever* spoken before with anyone present at court that day? Or whether he had spoken *that day* with anyone present before coming to court? And how many people were in the courtroom? The answer says nothing probative about Diante's reliability as a witness. There was no follow-up to make sure he even understood the question.

Even if some other aspects of Diante's testimony might reasonably have caused the finder-of-fact to question the reliability of his account, sorting out truthful from untruthful testimony is the essence of the *jury's* function in our criminal justice system. See *Scheffer*, 523 U.S. at 313 ("A fundamental premise of our criminal trial system is that the *jury* is the lie detector. Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'") (internal citation and some quotation marks omitted), quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891). Had Diante testified, the jury would have heard his account that he saw Jaquari wrap the cord around his own neck — the most valuable piece of evidence for Harris's defense. His testimony would also have been subjected to cross-examination, and the able prosecutors in this case no doubt would have tried to impeach him

on some of the same lines of questioning they raised at the competency hearing. That is how the adversary process is designed to work.

By finding Diante to be an incompetent witness, the trial court short-circuited that process and excluded Harris's best evidence of her innocence. It reached that conclusion in part by erroneously placing the burden of proof on the defense, and in effect presuming that Diante was incompetent. It also relied on the facts that Diante expressed age-appropriate beliefs in mythical or fictional characters, said he saw his brother "in heaven," and, in his response to a broad and confusing question from the bench, did not admit to having spoken with the prosecutor at some point before the hearing. These considerations did not reliably indicate that Diante's testimony at trial was likely to be so unreliable as to justify eliminating it completely from Harris's defense. The importance of this evidence substantially outweighed the danger that it would have injected inherently unreliable evidence into the trial.

In so holding, we emphasize that we do not decide whether the trial court's incompetency determination was erroneous as a matter of Illinois law. Obviously, "habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citations omitted), quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The Illinois Appellate Court determined that the trial court, despite its burden of proof error, did not abuse its discretion in applying Illinois's witness competency statute, and we do not disturb that conclusion. As the

Supreme Court cautioned long ago, the determination of competency "rests primarily with the trial judge, who sees the proposed witness, notices his manner, his apparent possession or lack of intelligence, and may resort to any examination which will tend to disclose his capacity and intelligence, as well as his understanding of the obligations of an oath." *Wheeler v. United States*, 159 U.S. 523, 524-25 (1895). Harris presented and we have considered a different question: whether in this case the damage done to Harris's defense by disqualifying Diante as a witness was disproportionate to the state's interest in guarding against the admission of unreliable testimony. That question is a Sixth Amendment question, and no state court addressed it. Answering it involves a familiar analytic tool of the law of evidence — balancing the probative value of a witness's testimony against the risk of "confusing the issues" or "misleading the jury." See Fed. R. Evid. 403. But our approach does not constitutionalize the law of evidence. On the contrary, by requiring state courts to consider the effect of an evidentiary exclusion on the right of the accused to present exculpatory testimony, we ensure that the rules of evidence will be applied in accord with the demands of the federal Constitution. That is a central function of the federal courts and of the habeas corpus writ itself.

If the Compulsory Process Clause is to be more than a "dead letter," see *Burr*, 25 F. Cas. at 33, it demands that courts recognize that the exclusion of defense evidence can have constitutional consequences beyond the rules of evidence. Here, state courts overlooked the Sixth Amendment significance of Diante's testimony. By

disqualifying Diante from taking the stand, the trial court deprived Harris of evidence that was favorable and material to her defense, and on the evidence before it, the exclusion was "arbitrary or disproportionate" to the interests served by the competency rule. The exclusion violated Harris's right to present a complete defense under the Sixth and Fourteenth Amendments of the U.S. Constitution.

IV. *Ineffective Assistance of Counsel Claim*

The Sixth Amendment also provides that the "accused shall enjoy the right to . . . have the Assistance of Counsel for his defense." To demonstrate that the right to counsel was violated by ineffective assistance, a criminal defendant must meet the familiar two-prong standard set forth in the leading case, *Strickland v. Washington*, 466 U.S. 668 (1984). First, she must show that her "counsel's performance was deficient" because it "fell below an objective standard of reasonableness." *Id.* at 687-88. Second, she must show that "the deficient performance prejudiced the defense," which means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Harris contends that her trial counsel was ineffective cumulatively throughout trial and for three specific deficiencies: (1) his performance at Diante's competency hearing; (2) his withdrawal of a motion to quash Harris's arrest; and (3) his failure to call expert witnesses on child asphyxiation and false confessions.

Under AEDPA, "the bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one, and only a clear error in applying *Strickland* will support a writ of habeas corpus." *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). However, "if a state court does not reach either the issue of performance or prejudice on the merits, then federal review [of that prong] . . . is *de novo*." *Sussman v. Jenkins*, 636 F.3d 329, 350 (7th Cir. 2011) (some internal quotation marks omitted), quoting *Toliver v. McCaughtry*, 539 F.3d 766, 775 (7th Cir. 2008).

Because the Illinois Appellate Court did not reach the *Strickland* performance prong, we consider that issue *de novo* and conclude that defense counsel's performance at the crucial competency hearing was constitutionally deficient. Applying AEDPA deference to the prejudice prong, we conclude that the court unreasonably misapplied *Strickland*. If counsel had provided effective assistance at the competency hearing, it is reasonably likely that Diante would have been allowed to testify. His testimony was pivotal to Harris's case, and there is at least a reasonable probability that it would have made a difference in the outcome of the trial.[18]

---

[18] Because we find that defense counsel's performance at the competency hearing did not meet the minimum standards

(continued...)

A. *Performance Prong*

To satisfy *Strickland*'s performance prong, the defendant must identify "acts or omissions of counsel that could not be the result of professional judgment." *U.S. ex rel. Thomas v. O'Leary*, 856 F.2d 1011, 1015 (7th Cir. 1988), citing *Strickland*, 466 U.S. at 690. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 131 S. Ct. at 788, quoting *Strickland*, 466 U.S. at 689. A reviewing court must seek to "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. We "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance," *id.*, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. The Illinois Appellate Court did not decide whether defense counsel's performance was deficient under *Strickland*. See *Harris*, 904 N.E.2d at 1097-98. Our review of Harris's claim under the performance prong is therefore *de novo*.

---

(...continued)

of professional competency imposed by the Sixth Amendment, and that there was a reasonable probability that these errors altered the outcome of Harris's trial, we do not address the other allegations of ineffectiveness.

We see three serious mistakes in trial counsel's performance at the competency hearing.[19] First, and most glaring, counsel did *nothing* to prepare Diante for his testimony. Second, counsel failed to secure the presence of Levy, the investigator for Child and Family Services who interviewed Diante the day of Jaquari's death. Third, counsel failed to correct the trial court's misplacement of the burden of proof on the defense at the competency hearing.

### 1. *Preparation*

Counsel admitted to the trial court that he had seen Diante on just one prior occasion (when he interviewed Dancy), had only spoken with the child in court just before the hearing, and that he "didn't ask [Diante] any questions" before he took the stand. Dkt. No. 1-17 at 93. According to the trial court, on the day Diante testified, defense counsel had yet to "determine whether they even wanted to call the witness." S.A. 56. These revelations are disturbing. The defense theory was that Jaquari's death was accidental. Diante was the *only* witness who could testify directly to that theory. The substance of Diante's testimony was not only exculpatory; no other witness contradicted it, and no other witness could replicate it. In terms of its strategic importance to

---

[19] Both parties assume, and we agree, that the competency hearing was a "critical stage" of the proceedings against petitioner during which her right to counsel remained in full force. See *United States v. Wade*, 388 U.S. 218, 224-25 (1967).

the defense, Diante's competency hearing was the whole defense.

Preparation is important with witnesses of any age, but it is critical with child witnesses, who are often nervous in unfamiliar settings and among strangers.[20]

_____

[20] See Nancy Walker Perry & Lawrence S. Wrightsman, *The Child Witness: Legal Issues and Dilemmas* 252-55 (1991); William Wesley Patton, *Viewing Child Witnesses through a Child and Adolescent Psychiatric Lens: How Attorneys' Ethical Duties Exacerbate Children's Psychopathology*, 16 Widener L. Rev. 369, 370 n.4 (2010), citing Andrea N. Welder, *Sexual Abuse Victimization and the Child Witness in Canada: Legal, Ethical, and Professional Issues for Psychologists*, 41 Canadian Psychol. 160, 164-65 (2000); Myrna S. Raeder, *Enhancing the Legal Profession's Response to Victims of Child Abuse*, 24 Crim. Just. 12, 43 (Spring 2009); Tom Harbinson, *When the Child "Freezes" in Court, Part One: Prevention, Reasonable Efforts* 2, Nat'l Dist. Attorneys Ass'n/Nat'l Ctr. for Prosecution of Child Abuse (2005), *available at* http://www.mcaa-mn.org/docs/2005/APRIReason — Part161005.pdf; Helen L. Westcott & Graham M. Davies, *Children's Welfare in the Courtroom: Preparation and Protection of the Child Witness*, 7 Child. & Soc'y 388, 389-91 (1993). In his evaluation of Diante, Dr. Galatzer-Levy emphasized the importance of questioning children in a manner consistent with their cognitive capacities, and he provided some background on child development and interview techniques. For example, "most children of Diante's age cannot answer an abstract question regarding the difference between the truth and a lie" but can have a "complete functional understanding of the concepts." S.A. 137-38. Likewise, while "[a]dults tend to conceptualize things that they themselves

(continued...)

Interviewing Diante in advance would have enabled defense counsel to familiarize Diante with the types of questions he would be asked, to anticipate the State's approach in challenging competency, and to develop a rapport with an understandably nervous and reticent child. In light of both the delicacy of child witnesses in general and the importance of this witness's testimony to the defense in particular, trial counsel's failure even to speak with Diante about his testimony is inexplicable.

The Supreme Court has said that "the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims." *Williams v. Taylor*, 529 U.S. 362, 391 (2000). In *Strickland* itself, the Supreme Court made clear that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. A "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances," which depend on the information the attorney had at his disposal. *Id.* "For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably

---

[20] (...continued)

witness as 'real,' referring to a highly abstract concept of truly existing," "[c]hildren of Diante's age . . . typically do not employ such abstractions in their thinking." S.A. 139.

diminished or eliminated altogether." *Id.* In this case, however, Harris's counsel clearly did not have all the information needed to question Diante effectively at his competency hearing. And what information counsel did have — above all, the facts that Diante was young and critical to the defense — would only have indicated to a reasonably diligent defense attorney the need for careful investigation and preparation.

Since *Strickland*, the Supreme Court has several times found that an attorney's failure to prepare or investigate witnesses or evidence was deficient performance. See, *e.g.*, *Porter v. McCollum*, 130 S. Ct. 447, 452-53 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374, 385 (2005); *Wiggins v. Smith*, 539 U.S. 510, 523-25 (2003). Here, too, counsel's failure to interview Diante overlooked obvious information — his age, importance as a witness, and the statements he made to Levy and Wilson — that urgently conveyed the need for more "thorough investigation." *Porter*, 130 S. Ct. at 452.

This court and other circuits have found that an attorney's failure to interview prospective witnesses can render his performance deficient under *Strickland*. See, *e.g.*, *Davis v. Lambert*, 388 F.3d 1052, 1063-64 (7th Cir. 2004) ("As Davis relied exclusively on a theory of self-defense at trial, his counsel's failure to interview Perry, the only other eye-witness to the altercation, is inexplicable."); *Washington v. Smith*, 219 F.3d 620, 632 (7th Cir. 2000) ("failure to try to ascertain what exculpatory evidence 'new' witnesses might have [was a] flagrant example[ ] of ineffective assistance"); *Sowell*

*v. Anderson*, 663 F.3d 783, 790 (6th Cir. 2011) (granting habeas relief and holding that "[c]ounsel's failure to interview Sowell's family was inconsistent with their obligation to conduct a thorough sentencing-phase investigation") (citations omitted); *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) (granting habeas relief and holding that, due to "the fact that there were only two adult eyewitnesses to the crime, it is evident that 'a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony'"), quoting *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994).

In *Stanley v. Bartley*, 465 F.3d 810 (7th Cir. 2006), defense counsel had not interviewed any prospective witnesses before trial. His "trial strategy . . . was to listen to the witnesses' direct testimony and cross-examine them regarding any discrepancies between that testimony and their pretrial statements that were harmful to his client." *Id.* at 812. The lawyer had "prepared for the trial by reading the statements that prospective witnesses had given the police" but "did not interview any of them." *Id.* Had he done so, it would have "enabled a damaging cross-examination" of a witness who himself "may have been the murderer" and allowed counsel to impeach as unreliable another witness who testified that the defendant had confessed to her. *Id.* We said that the failure to interview witnesses "was a shocking dereliction of professional duty." *Id.* at 813.

In this case, too, trial counsel's failure to conduct a careful interview with Diante fell below the minimum standards of professional reasonableness required

under *Strickland*. Any reasonably diligent attorney would have understood the special challenges in questioning witnesses of Diante's age, as well as the critical importance of his testimony.

We recognize that, in preparing for the testimony of child witnesses, attorneys should be especially careful to avoid suggesting answers or otherwise coaching the witness. See *Maryland v. Craig*, 497 U.S. 836, 868 (1990) (Scalia, J., dissenting); John R. Christiansen, *The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews*, 62 Wash. L. Rev. 705, 709-11 (1987). This does not mean, however, that lawyers must give up pretrial interviews altogether to avoid being accused of coaching child witnesses. A variety of procedural safeguards are available to ensure the integrity of children's testimony, such as having a child-witness examiner conduct or observe the interview, avoiding the use of leading questions, and of course videotaping the interview. See Christiansen, *supra*, at 713-14. If the attorney is concerned about being accused of coaching his child witness, the solution is to take these precautionary steps, not to forego preparation entirely.

Yet that is what Harris's attorney did here, and not because he made a tactical decision that investigative efforts would be counter-productive. Cf. *Bobby v. Van Hook*, 130 S. Ct. 13, 18-19 (2009) (counsel gathered substantial amount of information and then made reasonable decision not to pursue additional sources). Rather, at this important stage of trial, his unreadiness was all. See *Williams v. Lemmon*, 557 F.3d 534, 541 (7th

Cir. 2009) ("[In *Stanley*, 465 F.3d 810 (7th Cir. 2006),] Stanley's lawyer did not prepare for trial; he just showed up and winged it. That's ineffective assistance, when information in counsel's possession suggested that some potential witnesses had exculpatory information."). In fact, until just before Diante took the stand, counsel had not even made up his mind whether he wanted this pivotal witness to testify. Failing to interview Diante was not based on "reasoned strategic judgment." See *Wiggins*, 539 U.S. at 526.

### 2.  *Investigator Levy*

Second, trial counsel's performance was deficient for failing to secure the presence of Ale Levy, the Child Advocacy Center investigator who had spoken with Diante the day after his brother's death. Counsel's failure to discover and present exculpatory evidence that is reasonably available can constitute deficient performance. See, *e.g.*, *Wiggins*, 539 U.S. 523-29. And we have found *Strickland*'s performance prong met by a defense attorney's "inexplicable" refusal to investigate and call the only sober eyewitness to the altercation on which the defendant's murder conviction was based, given "the obvious importance of this potential testimony to [defendant's] self-defense argument." *Davis v. Lambert*, 388 F.3d 1052, 1064, 1063 (7th Cir. 2004). Here, Levy's testimony would have countered that of Karen Wilson, another state investigator who interviewed Diante and testified at the hearing that he had trouble distinguishing fantasy from reality. Levy would have demon-

strated that Diante's testimony was consistent with what he had told her (that Jaquari asphyxiated himself), and described Diante's satisfactory responses to her preliminary "qualifier" questions that gauged his memory and communication skills. Defense counsel subpoenaed Levy but conceded he did "nothing" to secure her actual presence.[21]

When Levy did not appear, counsel also did not explain to the trial court how critical she was, except to say that she had interviewed Diante. The trial court stated, "All right. . . . Diante may have been interviewed by . . . next-door neighbors or relatives or you. What I'm wondering is, what relevance is it to my determination at this point in time as to the witness's competency that other people have talked to him at other points in time?" Instead of explaining that Levy would show that Diante's account of Jaquari's death had remained consistent from day one, that he was capable of articulating

---

[21] In addition, even if Diante had nevertheless been found incompetent, his statements to Levy could have been admitted through Levy. Although such testimony would otherwise be hearsay, Illinois exempts statements made by a declarant who is unavailable where the statement concerns the history — explicitly including the "death"— of "another person, if the declarant was related to the other by blood, adoption, or marriage." Ill. Evid. R. 804(b)(4)(B). "A child witness is considered unavailable if the child is . . . declared incompetent because she is incapable of expressing herself so as to be understood concerning the matter." *People v. Learn*, 919 N.E.2d 1042, 1049 (Ill. App. 2009).

that account coherently when questioned by someone trained to question children, and that she would counter the testimony of Wilson, counsel withdrew his motion to call her and said he had nothing further. This was another major oversight that counsel could have avoided with modest efforts.

### 3.   *Incorrect Burden of Proof*

Finally, defense counsel was deficient in not correcting the trial court when it misallocated the burden of proof during the competency hearing. The Supreme Court determined in *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986), that *Strickland*'s performance prong was satisfied where counsel failed to file a suppression motion due to his "startling ignorance" of discovery rules. When an attorney takes or forgoes some action at trial due to ignorance of the law, that mistake can amount to constitutionally deficient performance. See, *e.g.*, *Wrinkles v. Buss*, 537 F.3d 804, 814-15 (7th Cir. 2008) (holding that counsel's ignorance of relevant law made performance objectively deficient under *Strickland*); *Barrow v. Uchtman*, 398 F.3d 597, 605 (7th Cir. 2005) (same); *Dixon v. Snyder*, 266 F.3d 693, 703 (7th Cir. 2001) (same); see also *Medina v. Diuglielmo*, 461 F.3d 417, 428-29 (3d Cir. 2006) (trial counsel's failure to object to competency of child witness, as required by Pennsylvania law, fell below an objective standard of reasonableness).

In this case, the trial court explicitly placed the burden of proof on Harris to establish that Diante was

competent to testify. Even the trial judge himself agreed later that this was an error. There is no tactical explanation for the failure to correct the judge's mistake — except that counsel too was unaware of Illinois law's presumption of competency. In the competency hearing, counsel even restated and compounded the trial court's error by asserting "that we've met our burden." Dkt. No. 1-17 at 100. By embracing without objection the misplaced burden to prove Diante was a competent witness, counsel made his job harder. A "reasonably competent attorney patently is required to know the state of the applicable law." *Medina*, 461 F.3d at 428, quoting *Everett v. Beard*, 290 F.3d 500, 509 (3d Cir. 2002), abrogated on other grounds by *Priester v. Vaughn*, 382 F.3d 394 (3d Cir. 2004). In this regard, as well, counsel's performance at the competency hearing was deficient.

We conclude that the performance of Harris's trial counsel was unconstitutionally deficient in failing (1) to interview Diante prior to his testimony; (2) to secure the presence of Ale Levy; and (3) to correct the court's legal error in placing the burden on the defense. We now turn to whether Harris was prejudiced by these deficiencies.

B. *Prejudice Prong*

1. *Legal Standard*

To show the required prejudice, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 694. This does not mean that the defendant must show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, a "reasonable probability is a probability sufficient to undermine confidence in the outcome," *id.* at 694, which in turn means a "substantial, not just conceivable" likelihood of a different result. *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011); see also *Canaan v. McBride*, 395 F.3d 376, 386 (7th Cir. 2005) ("Even if the odds that the defendant would have been acquitted had he received effective representation appear to be less than fifty percent, prejudice has been established so long as the chances of acquittal are better than negligible."), quoting *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 246 (7th Cir. 2003). Making this probability determination requires consideration of the "totality of the evidence before the judge or jury," *Strickland*, 466 U.S. at 695, and a "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," *id.* at 696. The Supreme Court has reaffirmed this framework repeatedly. See, *e.g.*, *Richter*, 131 S. Ct. at 787-88; *Rompilla*, 545 U.S. at 380-81; *Wiggins*, 539 U.S. at 521.

The Illinois Appellate Court determined that Harris was not prejudiced by counsel's performance at Diante's competency hearing, so AEDPA requires us to ask whether the state court reached a decision that was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A

state court's decision is "contrary to" clearly established federal law where it is "substantially different from the relevant precedent of [the Supreme] Court." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An "unreasonable application" occurs when a state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Williams*, 529 U.S. at 413.

### 2. *Application*

Determining whether Harris was prejudiced by her counsel's errors at the competency hearing actually involves two separate inquiries: first, whether the admission of Diante's testimony at trial would have had a reasonable probability of changing the jury's verdict; and second, whether the errors had a reasonable probability of influencing the outcome of the competency hearing itself.

### a. *Effect on the Verdict*

We have already answered the first question by concluding (though under *de novo* review) that the exclusion of Diante's testimony was material for purposes of the Compulsory Process Clause. See *ante*, section III.B.1, at 36-47. When a defendant is deprived of favorable evidence, the same "reasonable probability" standard applies to determining materiality under *Brady* and the Compulsory Process Clause, and to determining

whether the accused was prejudiced for the purposes of *Strickland*. See *Strickland*, 466 U.S. at 694 ("Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness.") (citations omitted); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867-68 (1982) (noting existence of "materiality requirement" in "what might loosely be called the area of constitutionally guaranteed access to evidence"). The relevant standard is whether, if Diante had testified, there was a "reasonable probability" that the result of Harris's trial would have been different. We have already found that the exclusion of Diante's testimony was material to Harris's defense, analogizing to the *Brady* line of cases. Because of the equivalency between *Brady* materiality and *Strickland* prejudice, the same conclusion must apply to defense testimony that is absent from trial due to deficient performance of defense counsel.

Our review on the *Strickland* prejudice issue, however, must be deferential under AEDPA. To grant habeas relief on Harris's *Strickland* claim, we must conclude not just that there was a reasonable probability that Diante's testimony would have changed the outcome of trial, but that the state court's conclusion to the contrary was an unreasonable application of clearly established law.

For two reasons, we conclude that the state court's application of *Strickland*'s prejudice prong was not just

wrong but unreasonable. First, the court failed to analogize to the Supreme Court's *Brady* precedents, which show unmistakably that the suppression of exculpatory evidence from or relating to the case's sole eyewitness is reasonably probable to change the outcome of trial. See *Smith v. Cain*, 132 S. Ct. 627, 630-31 (2012); *Kyles v. Whitley*, 514 U.S. 419, 441-45 (1995); *United States v. Agurs*, 427 U.S. 97, 112-13 n.21 (1976). A state court decision "involves an unreasonable application of this Court's precedent if the state court . . . unreasonably refuses to extend [a legal principle from Supreme Court precedent] to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 361, 407 (2000). The *Strickland* prejudice and *Brady* materiality standards are identical. Harris's ineffective assistance claim is an obvious context to which the principle illustrated by *Smith*, *Kyles*, and *Agurs* should apply. See *Strickland*, 466 U.S. at 694.

Second, the Supreme Court's *Strickland* precedents also show that a defense counsel's failure to secure significant exculpatory or mitigating evidence can be prejudicial to the defense. See *Porter v. McCollum*, 130 S. Ct. 447, 453-56 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534-38 (2003). Our own precedents also demonstrate that *Strickland*'s prejudice prong is met when defense counsel's deficient performance causes critical exculpatory testimony to be absent from trial. See, *e.g.*, *Toliver v. McCaughtry*, 539 F.3d 766, 776-78 (7th Cir. 2008) (holding that trial counsel's failure to call two witnesses who would have offered testimony tending to show

defendant "had no intention of aiding and abetting in [accomplice's] murder" and "would have enhanced significantly the chances of the jury's accepting [the defendant's] characterization of the facts," prejudiced his defense, and the state court's determination to the contrary was "not only incorrect but unreasonable"); *Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000) (granting habeas writ and finding that petitioner was prejudiced by counsel's failure to produce alibi witnesses for trial because, even though another alibi witness did testify for the defense, the additional and more credible witnesses "would have added a great deal of substance and credibility" to petitioner's alibi). So, too, do a number of cases in other circuits. See, *e.g.*, *Stewart v. Wolfenbarger*, 468 F.3d 338, 360-61 (6th Cir. 2006) (granting writ on the grounds that the petitioner was prejudiced by counsel's failure to secure the testimony of alibi witnesses and to call a witness who would have testified that a major prosecution witness lied in testifying that petitioner had threatened the victim before she was killed); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004) (granting writ and holding that petitioner was prejudiced by counsel's failure to secure testimony of alibi witnesses); *Anderson v. Johnson*, 338 F.3d 382, 393-94 (5th Cir. 2003) (granting writ and finding that counsel's failure to call the only known exculpatory eyewitness satisfied *Strickland*'s prejudice requirement).

These cases all fit with the lesson of the Supreme Court's *Brady* jurisprudence: when a defendant is deprived of the exculpatory, non-cumulative testimony of one of the case's few eyewitnesses, or the *only* eye-

witness, there is a reasonable probability the result would have been different.[22]

---

[22] In a number of similar cases, circuit courts have strongly suggested that the prejudice prong was met and remanded for an evidentiary hearing to determine the precise nature of the omitted testimony. See, *e.g.*, *United States v. Moore*, 651 F.3d 30, 87-88 (D.C. Cir. 2011) (per curiam) (concluding that habeas petitioner "has made a 'colorable claim' that his counsel's decision not to call" the shooting's only eyewitness, who identified someone else as the assailant "was constitutionally deficient and that he was prejudiced by his counsel's conduct," but remanding for an evidentiary hearing because of "lack of clarity" as to "the precise nature of [the witness's] testimony"), cert. denied in part and granted in part on other grounds *sub nom. Smith v. United States*, 132 S. Ct. 2772 (2012); *Harrison v. Quarterman*, 496 F.3d 419, 427-28 (5th Cir. 2007) (stating that "counsel prejudices his client's defense when counsel fails to call a witness who is central to establishing the defense's theory-of-the-case," and concluding that "in this case, there exists a 'reasonable probability' that, but for counsel's errors, the jury might have reached a different verdict," but remanding for evidentiary hearing to determine what witness's testimony would have been because "the only evidence of what [witness] would have testified to comes from" petitioner and witness "has not provided an affidavit from [witness] indicating that [he] would have been willing to testify"); *Davis v. Lambert*, 388 F.3d 1052, 1064-65 (7th Cir. 2004) (holding that counsel was ineffective in failing to interview only sober eyewitness to death of victim, stating that if his testimony would have supported theory of self-defense advanced at trial by the

(continued...)

To the extent the Illinois Appellate Court concluded that the failure to secure Diante's testimony at trial did not prejudice Harris's defense, it was an unreasonable application of *Strickland* and its progeny. If, as a result of ineffective assistance of counsel, Harris was deprived of Diante's testimony, the errors prejudiced her defense.

b. *Effect on the Competency Decision*

Whether it is reasonably likely that counsel's errors altered the result of the competency hearing is a separate question. The Illinois Appellate Court deter-

---

[22] (...continued)

petitioner, "there is a reasonable probability that a court could find" that he acted in self-defense, and remanding for evidentiary hearing to determine what the anticipated testimony of that witness would have been).

Here, we have a clear idea of what Diante's testimony would have been because he testified to the same matters at the competency hearing at the time of trial. This sharply distinguishes this case from *Harrison*, *Moore*, and *Davis* and makes remand for an evidentiary hearing unnecessary. See *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("an evidentiary hearing is not required on issues that can be resolved by reference to the state court record"), quoting *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998); see also *Siverson v. O'Leary*, 764 F.2d 1208, 1218 (7th Cir. 1985) (declining to remand for evidentiary hearing to consider prejudice prong unaddressed by district court where record was sufficient for review).

mined that they did not, and we may therefore grant the writ only if this decision was also an unreasonable application of Supreme Court precedent. The appellate court gave two reasons: first, "the record reflects that defense counsel as well as the prosecutor spoke with Diante before he testified and counsel makes no showing that a different result would have obtained had there been more extensive preparation," and second, "the trial judge noted in denying defendant's posttrial motions[ ] [that] his ruling would have been the same had the burden been properly placed" on the State and that Levy's testimony "would [not] have changed his opinion concerning Diante's competency." *Harris*, 904 N.E.2d at 1098. There are two problems with this analysis.

First, it weighs *in isolation* the effect of each aspect of counsel's deficient performance on the outcome of the competency hearing, rather than, as the Supreme Court requires, assessing the "totality of the omitted evidence." *Williams*, 529 U.S. at 397. To determine whether a different outcome is reasonably probable, the court must "evaluate the totality of the available . . . evidence — both that adduced at trial" and the additional available evidence that adequate counsel would have procured." *Id.* The "predictive judgment" thus does not depend "on the notion that a single item of omitted evidence . . . would require a new hearing." *Id.*; see also *Strickland*, 466 U.S. at 695 ("In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Washington v. Smith*, 219 F.3d 620, 634-35 (7th Cir. 2000) ("Evaluated

individually, these errors may or may not have been prejudicial to Washington, but we must assess 'the totality of the omitted evidence' under *Strickland* rather than the individual errors. Considering the 'totality of the evidence before the . . . jury,' [trial counsel's] unprofessional errors were prejudicial to Washington.") (citation omitted). The question is whether counsel's entire performance at the hearing prejudiced Harris. By analyzing each deficiency in isolation, the appellate court clearly misapplied the *Strickland* prejudice prong.

Second, the appellate court improperly relied on the trial judge's own *post hoc* rationalization (during the proceedings on Harris's motion for a new trial) that a more diligent performance would not have changed his mind. Under *Strickland*, the assessment of prejudice is an objective inquiry that "should not depend on the idiosyncracies of the particular decisionmaker," which "are irrelevant to the prejudice inquiry." 466 U.S. at 695; see also *Raygoza v. Hulick*, 474 F.3d 958, 964 (7th Cir. 2007) ("we cannot accept as conclusive the judge's statement that the new evidence would not have made any difference to the outcome of the case"); *Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997) (trial judge's assertion in a post-conviction proceeding that petitioner's "additional evidence would not have changed his mind . . . cannot, however, be conclusive"). By focusing on how the trial judge personally would have ruled in the competency hearing if Harris's counsel had performed adequately, the Illinois Appellate Court allowed subjective analysis to creep into the prejudice inquiry. The court's reasoning was therefore a misap-

plication of *Strickland*, under which courts must consider the effect the evidence would have had on an unspecified, objectively reasonable decision-maker — not its effect on one particular judge.

The appellate court's prejudice determination was unreasonable insofar as it failed to apply the correct framework. Applying that correct framework, the combined effect of counsel's errors was clearly prejudicial. At a minimum, the application of the correct burden of proof would, as a matter of law, have precluded finding Diante incompetent under the second prong of the competency statute, his capacity to understand a witness's duty to tell the truth. The trial court said in his ruling at trial that he did not "find *any* questions at all that were posed to the witness with regard to his understanding of any concept of a duty to tell the truth when presented in a courtroom," and that the "witness was *never* asked whether he would promise to tell the truth and what that might mean to him here in this proceeding." S.A. 87, 88 (emphasis added). The trial court ruled that Diante was incompetent under the second prong because he erroneously believed that the proponent of the witness bore the burden to establish competency. Had Harris's counsel called the court's attention to this error, the absence of any testimony as to the second prong would as a matter of law have foreclosed finding Diante incompetent on that basis. Diante's statement that he knew the difference between lying and truth-telling and that he could be punished for the one and rewarded for the other was enough to find him competent on the second prong.

As for the first prong, it is true that the application of the proper burden of proof would not, by itself, have compelled the court to find Diante capable of expressing himself coherently. But in light of the evidence that was presented at the hearing, it is reasonably likely that a different result would have obtained if defense counsel had prepared for Diante's testimony, secured the presence of Levy, and objected to the court's presumption against Diante's competency. The only actual and possible basis in the record for the conclusion that Diante was incapable of expressing himself was the idea that he could not "differentiate between reality and fantasy."

There is no doubt that adequate preparation for Diante's testimony would have mitigated the adverse effect of his saying that Santa Claus, the tooth fairy, and Spiderman were "real." Reading Karen Wilson's interview with Diante would have alerted counsel that this issue would likely come up on cross-examination and that counsel should be ready to clarify the boy's understanding in the hearing. The prosecutor's questions on this subject were confusing. At one point she asked about the difference between "real things" and "cartoons," and then shifted to the difference between "real" and "something else" — by which she evidently meant "fictitious." Adequate preparation of the witness would have enabled defense counsel to recognize this obvious misunderstanding and to correct it on re-direct or by asking that the questions be made clear for the six-year-old witness. And interviewing Diante in advance would have allowed counsel to develop a rapport with

the witness and to anticipate the linguistic quirks (such as pronouncing "limo" like "rainbow" and referring to church as "heaven") that made some of Diante's responses more difficult to comprehend. In short, preparing Diante for his testimony would have made defense counsel a better examiner and Diante a better witness.

Levy would have strengthened the credibility of Diante's version of how Jaquari died by showing that his account had remained consistent. Since the day after the tragedy, he had said that Jaquari put the string around his neck. Levy's testimony also would have directly contradicted the testimony of investigator Wilson, who suggested at the hearing that Diante had trouble distinguishing reality from fantasy and that he had told her that he was asleep when Jaquari got hurt. See Dkt. No. 1-17 at 86-87. Diante also told Levy that he was asleep when Jaquari died, but he also explained that Jaquari was playing and wrapped the elastic from the sheet around his neck, and that "'Jaquari had a bubble' while he was asleep." S.A. 105. Levy's testimony thus could have helped reconcile an apparent discrepancy in Diante's account. The Levy interview notes also indicated that Diante was competent to testify, observing that he knew his age, colors, numbers, and the "difference between truth/lies." S.A. 104. As a trained child-witness examiner in the state's law enforcement apparatus, Levy's observations and opinions of Diante likely would have been helpful in showing the trial court that Diante could provide competent testimony.

If counsel had prepared adequately for Diante's testimony and secured Levy's presence, the evidence in support of Diante's competency probably would have outweighed the evidence against it. Even without Levy and with an unprepared Diante, the trial judge said that he had "considerable question" as to Diante's capacity to express himself so as to be understood. With the benefit of Levy's testimony and modest preparation of Diante, it is reasonably likely that Diante would have been found competent. Even if the evidence were only in equipoise, the court still should have found Diante competent if trial counsel had objected to the misallocation of the burden of proof. If counsel had made the needed effort, it is reasonably likely that an objective decision-maker would have found Diante competent to testify. The Illinois Appellate Court's opinion to the contrary is itself unreasonable.

Harris has demonstrated that her defense counsel's performance was deficient at Diante's competency hearing, and that, but for his unprofessional errors, there was a reasonable probability that both the outcome of that hearing and the outcome of her trial would have been different. Because of clear errors the Illinois Appellate Court made in applying the prejudice standard as developed by the Supreme Court's cases under *Strickland*, we find its decision on that issue to have been an unreasonable application of clearly established law. See 28 U.S.C. § 2254(d)(1).

*Conclusion*

The decision of the district court is REVERSED and the case REMANDED with instructions to grant a writ of habeas corpus unless the State elects to retry Harris within 120 days after issuance of the mandate.

MANION, *Circuit Judge*, concurring. I concur with the court's comprehensive opinion. The Sixth Amendment of the United States Constitution provides that the accused shall have the right "to have compulsory process for obtaining witnesses in his favor." This seldom-visited provision necessarily emerges under the facts of this case. Forty-five years ago the Supreme Court summed it up pretty well.

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to

> present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967).

At the time of Jaquari's death, his brother Diante was five years old. Apparently he was the only one in the room when Jaquari became strangled by the elastic band from the fitted bed sheet. After many hours in custody, Nicole Harris made a very lucid confession, on videotape, under careful questioning by the prosecuting attorney. When this was presented at trial, Ms. Harris vehemently challenged it. Nevertheless, the jury viewed it in full.

The court cites several shortcomings in Harris's counsel's performance that contributed to the decision not to allow Diante's testimony. In that regard, I agree that counsel's assistance was ineffective.

If the government chooses to retry the case, presumably two things will occur. The jury will again see the taped confession and Ms. Harris will similarly challenge it. But when Diante testifies, he will be 13 or 14 years old. No doubt he has reflected on what he saw (and did not see) ever since, especially during his visitations in prison with his mother during the intervening years. His reflections will be much more precise, and in all likelihood beneficial to his mother.

Regardless of the decision whether or not to retry, or the subsequent testimony if it is tried, nothing will override the tragedy of Jaquari's death.